### JAMES BURT *vs.* ADVERTISER NEWSPAPER COMPANY.

Suffolk.    January 21, 22, 1891. — June 29, 1891.

Present: FIELD, C. J., ALLEN, HOLMES, & MORTON, JJ.

*Privileged Communication — Damages — Evidence — Repetitions.*

A newspaper may lawfully make fair comments on the conduct of private persons affecting the administration of the custom-house.

Newspaper articles, containing direct and indirect allegations of fact touching a custom-house broker, and highly detrimental to him, charging him with being a party to alleged frauds on the revenue, are not privileged so far as they contain false statements.

A person publishes libellous matter at his peril; and it is no justification that he had reasonable cause to believe it to be true.

The liability for libel is the usual liability in tort for the natural consequences of a manifestly injurious act; the defendant's motives or actual malice, except so far as manifested, are immaterial apart from the Pub. Sts. c. 167, § 80, and possibly from privilege.

In an action for libel contained in a newspaper article charging the plaintiff with frauds on the revenue, the defendant cannot show that the plaintiff's damages are lessened by the previous publication of the charges, unless the article professes on its face to be, and is in fact, based upon them.

In an action for libel contained in a newspaper article charging the plaintiff with

being connected with frauds upon the revenue, an *ex parte* report upon the same subject, made to the Treasury Department, containing similar charges against the plaintiff, was offered in evidence, coupled with proof that the writer of the articles had this document before him and believed the statements contained therein to be true. The article referred to the report in terms, and stated that certain affidavits contained therein, as well as other affidavits denying them, when marshalled together, made a terrible indictment against the plaintiff, that the later affidavits evidently were intended to shield him, and implied that the public on reading the two sets of affidavits would believe those contained in the report. *Held*, that the report was admissible by reason of the reference to it in the article, and as bearing on the question of damages.

In an action for a libellous publication, charging the plaintiff with being connected with frauds in a certain custom-house, in which one evidence of such fraud is that sugar is valued there lower than in another custom-house, evidence is admissible that the polariscope used in the latter custom-house does not give too high a valuation.

A wrongdoer is not bound to anticipate the general probability of wrongful acts by third persons, e. g. the repetition of a libel, any more than a particular act by this or that individual.

In an action for libel, it is misleading to instruct the jury that "one who publishes a libel is not responsible for the publication of it by others, . . . but he is under obligation to the plaintiff to take into account and into consideration what will be the natural and probable consequences of his act in putting a libel into circulation; to that extent he is responsible, and only to that extent."

TORT, for alleged libels, contained in articles published in January and February, 1889, in successive issues of the Boston Daily Advertiser. The declaration was in four counts. The first article, which was referred to in the first count, and was entitled " A Plague Spot," contained the following: " It is surprising how the New York press has rallied unitedly about the frauds which, at that custom-house, cheat the government out of from ten million dollars to thirty million dollars annually. It is not surprising in the Evening Post, whose close relation with the Burts is understood. One Burt is the broker of the Havemeyer sugar people, and boasts that he makes more than fifty thousand dollars a year in that interest by his influence in securing re-appraisals in the valuations of sugar imported by that great house. The other is Naval Officer of that port, and his long-time connection with some of the most disreputable elements in the New York custom-house has been a matter of public knowledge. . . . The system of frauds has gone so far that claims for damage allowances — that is, reductions in duty for damage suffered by goods in transit — have been all made and ready before the vessel arrived in

port, and passed, as a matter of course, by accommodating customs officials, at the demands of ' brokers,' who, by a system of ' addition, division, and silence,' have got the appraising department under their control, and made it impossible for importers to do business except through them. . . . Two years of honest administration in New York would restore to our producers the advantage that is sought to be gained for them by the tariff, and which is abated every day by the payment of money by the customs officials in the interest of the foreign manufacturers and their agents in New York City."

The second article, which was referred to in the second count, was entitled " The New York Scandal," and contained the following : " The systematic attempt of the New York papers to belittle and attack the Boston men who have uprooted and shown up the glaring frauds in the New York custom-house would be amusing, if it was not suggestive of things which we will not call by stray names. . . . Now what does this mean ? It means that the vilest conspiracy against the laws since the war has been going on in the New York custom-house, and has in part been shown up by Appraiser Stearns, and Special Agent Byrne, of Boston. The corrupt men brought to light are straining every nerve to bedraggle both these men. The newspapers of New York, either by accident or design, fling mud at them. . . . The New York custom-house for years — and we say this on authority — has been the scene of the most corrupt violations of the customs laws the country has ever seen. Men have grown rich in corruption, and in daily open, flagrant violation of the law. This man Burt, the brother of the Naval Officer of the port, as has repeatedly been stated, has brought nearly all the great sugar importers to employ him as a broker, because he has had the entire sugar appraising division under his control. His adherents claim, that after the 4th of March the men who have been discharged for corruption will be returned to office, and that the honest methods which have been established there since Appraiser Stearns went over from Boston will be a thing of the past as soon as a New-Yorker is made Secretary of the Treasury."

The third article, which was referred to in the third count, was entitled " Naval Officer Burt," and, after setting out a letter " To the Editor of the Advertiser " expressing the writer's astonish-

ment at the paper's reference to that officer, concluded as follows: " The reference to Naval Officer Burt was not intended to reflect on his personal integrity, and was an over strong expression of the regret felt that it is his brother, James Burt, who is involved in the long established and outrageous sugar frauds at that custom-house which are now being brought before the country. Their relationship has undoubtedly been relied upon to help James Burt in his dealings, though Silas Burt may be perfectly innocent of them. It is unfortunate, we say, though not a proof of evil on the part of the Naval Officer, that his brother has for years, undisturbed, carried on the practices which now, when exposed, hold the New York custom-house up as a national disgrace. — Ed. Advertiser."

The last article, referred to in the fourth count, was entitled " Where is the Perjury ? " and was as follows : " Is the New York Evening Post crazy or malicious in its attempt to shield and defend the sugar frauds in that city ? On Tuesday it printed a lot of affidavits from the discharged employees of the custom-house, in which they deny absolutely the affidavits made by them in Special Agent Byrne's report. When marshalled together, they made a terrible indictment against Broker Burt, brother of Naval Officer Burt. These new affidavits are intended, evidently, to shield Broker Burt. This is a matter worthy of attention. Every one of the affidavits made in Byrne's report was written out either by Special Agent Moore or official stenographer Kerr. Each one, after being written out, was read through and subscribed to by each one of those who now swear that they are false. Either they have committed perjury, or the officers of the hearing, in order to make a case, have taken refuge in forgery. The public will decide for itself which of these ultimations is true. Secretary Fairchild ought to do this at once ; then ask the district attorney in New York to indict the parties of one or the other of these two sides. Now that he is after this great fraud, let him show to the New York Evening Post, and also to these men who are so handy with their affidavits, that whichever one of these parties, officials, or discharged employees has resorted to perjury or forgery must go to state's prison. The more this matter is shown up, and especially by the defences printed by the New York Evening Post, the more evident it

is that the worst nest of rascals in the federal administration has been brought to light. And yet some of the great New York papers see nothing in the matter but cause of contempt, because Appraiser Stearns and Special Agent Byrne went from Boston."

Trial in the Superior Court, before *Dunbar*, J., who, after a verdict for the plaintiff, allowed exceptions, which, so far as material to the points decided, appear in the opinion.

*A. Hemenway & H. N. Sheldon*, for the defendant.

*R. M. Morse, Jr. & F. J. Stimson*, for the plaintiff.

HOLMES, J. In this case there must be a new trial. We shall state the grounds on which we come to this conclusion, and shall discuss such of the rulings as dealt with questions which are likely to come up again. Some matters not likely to recur we shall pass over. The first question which we shall consider is raised by the presiding judge's refusal to rule that the articles were privileged. The requests referred to each article as a whole. Each article contained direct and indirect allegations of fact touching the plaintiff, and highly detrimental to him, charging him with being a party to alleged frauds in the New York custom-house. Some or all of these allegations we must take to be false. In our opinion the rulings asked were properly refused.

We agree with the defendant, that the subject was of public interest, and that in connection with the administration of the custom-house the defendant would have a right to make fair comments on the conduct of private persons affecting that administration in the way alleged. But there is an important distinction to be noticed between the so called privilege of fair criticism upon matters of public interest, and the privilege existing in the case, for instance, of answers to inquiries about the character of a servant. In the latter case, a *bona fide* statement not in excess of the occasion is privileged, although it turns out to be false. In the former, what is privileged, if that is the proper term, is criticism, not statement, and however it might be if a person merely quoted or referred to a statement as made by others, and gave it no new sanction, if he takes upon himself in his own person to allege facts otherwise libellous, he will not be privileged if those facts are not true. The reason for the dis-

tinction lies in the different nature and degree of the exigency and of the damage in the two cases. In these, as in many other instances, the law has to draw a line between conflicting interests, both intrinsically meritorious. When private inquiries are made about a private person, a servant, for example, it is often impossible to answer them properly without stating facts, and those who settled the law thought it more important to preserve a reasonable freedom in giving necessary information than to insure people against occasional unintended injustice, confined as it generally is to one or two persons. But what the interest of private citizens in public matters requires is freedom of discussion rather than of statement. Moreover, the statements about such matters which come before the courts are generally public statements, where the harm done by a falsehood is much greater than in the other case. If one private citizen wrote to another that a high official had taken a bribe, no one would think good faith a sufficient answer to an action. He stands no better, certainly, when he publishes his writing to the world through a newspaper, and the newspaper itself stands no better than the writer. *Sheckell* v. *Jackson,* 10 Cush. 25, 26.

The distinction to which we have referred has been brought out more clearly in England than it has been in our own decisions. Thus, in *Davis* v. *Shepstone,* 11 App. Cas. 187, 190, Lord Herschell says: " It is one thing to comment upon or criticise, even with severity, the acknowledged or proved acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct. In the present case the appellants, in the passages which were complained of as libellous, charged the respondent, as now appears without foundation, with having been guilty of specific acts of misconduct and then proceeded on the assumption that the charges were true, to comment upon his proceedings in language in the highest degree offensive and injurious ; not only so, but they themselves vouched for the statements by asserting that though some doubt had been thrown upon the truth of the story, the closest investigation would prove it to be correct. In their Lordships' opinion there is no warrant for the doctrine that defamatory matter thus published is regarded by the law as the subject of any privilege." *Popham* v. *Pickburn,* 7 H. & N. 891, 898. *Lefroy* v. *Burnside,* 4 L. R. Ir. 556,

565, 566.  *Campbell* v. *Spottiswoode,* 3 B. & S. 769, 779.  *Walker* v. *Brogden,* 19 C. B. (N. S.) 65.  *Regina* v. *Flowers,* 44 J. P. 377, 378.  *Negley* v. *Farrow,* 60 Md. 158.  See *Hamilton* v. *Eno,* 81 N. Y. 116 ; *State* v. *Schmitt,* 20 Vroom, 579, 586 ; *Eviston* v. *Cramer,* 57 Wis. 570 ; *Scripps* v. *Foster,* 41 Mich. 742, 746 ; *Sheckell* v. *Jackson,* 10 Cush. 25, 26.

The foregoing language is applicable to the case at bar.  The defendant in all the articles makes statements of fact on its own behalf, and in the second article fairly may be understood to intimate that the private sources of information alleged by the words " we say this on authority," apply not merely to the existence of corruption in the New York custom-house, but to the plaintiff's connection with it.  The articles published by the defendant, so far as they contained false statements, were not privileged. We should add, however, with reference to another trial, that there was evidence that some of the charges in the articles were true, and so far as the jury might find them to be so, inasmuch as the matter under discussion was a matter of public concern, the defendant would be justified not only in making those charges, but in free and open comment and criticism in regard to them.

The next question, the first which is raised by the bill of exceptions, is whether the court below rightly excluded a letter from the Secretary of the Treasury of the United States, and an *ex parte* report on the same subject made to the Treasury Department, containing similar charges against the plaintiff, coupled with evidence that the writer of the articles had these documents before him, and believed the statements contained in them.  The evidence was offered to show that the defendant acted in good faith, and, as it is commonly said, to negative express malice, in support of its plea of privilege ; also as bearing on damages, and generally for any purpose for which it might be admissible.

We already have considered how the defendant stands in respect of privilege.  It is said that the report tended to prove that the defendant had reasonable cause to believe the charges to be true, and that it tended to show that the plaintiff was less damaged than he otherwise would have been by reason of the fact that similar charges had been made and published before.

As to the former of these suggestions, it is enough to say that it is not a justification that the defendant had reasonable cause to believe its charges to be true. A person publishes libellous matter at his peril. *Watson* v. *Moore,* 2 Cush. 133, 140. *Parkhurst* v. *Ketchum,* 6 Allen, 406. *Clark* v. *Brown,* 116 Mass. 504, 507.

Then as to damages. The damages recovered are measured in all cases by the injury caused. Vindictive or punitive damages are never allowed in this State. Therefore, any amount of malevolence on the defendant's part in and of itself would not enhance the amount the plaintiff recovered by a penny, and reasonable cause to believe the charges or absolute good will would not cut it down. *Watson* v. *Moore,* 2 Cush. 133. *Parkhurst* v. *Ketchum,* 6 Allen, 406. *Clark* v. *Brown,* 116 Mass. 504. Apart from the statute, (Pub. Sts. c. 167, § 80,) and possibly from privilege, the defendant's motives and intent are totally immaterial. Its liability is the usual liability in tort for the natural consequences of a manifestly injurious act. No doubt there might be cases, especially of slander, where it is impossible photographically and phonographically to reproduce the overt act complained of, where the defendant's motive would afford an inference as to the character of the act and the impression made by it. No doubt a manifestation of malevolent motives might enhance damages under our rule allowing damages for injured feelings. *Mahoney* v. *Belford,* 132 Mass. 393, 394. *Hastings* v. *Stetson,* 130 Mass. 76, 78. *Markham* v. *Russell,* 12 Allen, 573. See *Ford* v. *Ford,* 143 Mass. 577, 579; *Leonard* v. *Allen,* 11 Cush. 241. But there is nothing of that sort in this case. *Watson* v. *Moore,* 2 Cush. 133, 140. *Clark* v. *Munsell,* 6 Met. 373, 388.

As a general proposition, the defendant cannot show that the plaintiff's damages are less than they otherwise would have been because the charge has been made and published before. *Mahoney* v. *Belford,* 132 Mass. 393. *Peterson* v. *Morgan,* 116 Mass. 350, and cases cited. *Alderman* v. *French,* 1 Pick. 1, 18. See *Scott* v. *Sampson,* 8 Q. B. D. 491; *Hatfield* v. *Lasher,* 81 N. Y. 246, 249, 250. But with reference to what we shall have to say concerning the fourth count, it should be added that probably a different rule would apply if the defendant's publication pro-

fesses on its face to be based upon other publications which are referred to, and the fact is so.

The last ground on which it was argued that the report should have been admitted was that it was made a part of the libel by reference. We are of opinion that the articles, with the exception of that set out in the fourth count, do not refer to the report in such a way as manifestly on their face to need the report in order to explain them. The report was laid before us by agreement of counsel. It is a very long document, which it would have been useless to read through to the jury, and, from such inspection as we have been able to make, does not in any way explain, qualify, or mitigate the expressions used by the defendant. On the contrary, its only effect could be to raise either a belief or a strong suspicion that the defendant's charges were true. For that purpose it was of course incompetent, and therefore as a practical matter the only effect of allowing it to go in would have been an injustice to the plaintiff. But the article set out in the fourth count stands somewhat differently from the others. This refers to the report in terms, and then proceeds to say that the affidavits in the report and the later affidavits denying the former, when marshalled together, make a terrible indictment against the plaintiff, — that the new affidavits evidently are intended to shield him, — and implies that the public, on reading the two sets, will believe the former. The jury, if they should compare the documents, might agree with the inferences of the defendant, and to that extent might find the allegations of the article to be true. Under this count alone the report should have been admitted, for the above reason, and with reference to the damages, as we have stated earlier.

Another exception is to the exclusion of evidence that the polariscope used in the Boston custom-house did not give too high a valuation. One evidence of fraud in the New York custom-house was that sugar was valued lower there than in Boston. The plaintiff admitted the fact, and gave as one reason for it that the Boston examiner overestimated the quartz plate by which he tested his instrument. He gave this reason when attempting to secure the removal of the Boston examiner from New York, after the latter had been sent there to reform the alleged New York practices. The evidence offered tended to

prove the existence of the fraud, and perhaps that the plaintiff knew of its existence, and should have been admitted.

The court was asked to rule that the plaintiff could not recover for repetitions of the defendant's libels by others, and several other rulings tending in the same direction were asked. The court instructed the jury as follows: " One who publishes a libel is not responsible for the publication of it by others; that is to say, he is not responsible for the injurious act of another. But there is a general principle which runs through all tort cases, which is generally stated in this way: that a man is presumed to intend the natural and probable consequences of his acts, and that request for instruction therefore should be qualified in that way. He is not responsible for the injurious acts of another in publishing, but he is under obligation to the plaintiff to take into account and into consideration what will be the natural and probable consequences of his act in putting a libel into circulation. To that extent he is responsible, and only to that extent." The general proposition laid down is correct, no doubt, if rightly understood, and it was applied to libel, under what circumstances and with what meaning does not appear, in *Miller* v. *Butler*, 6 Cush. 71. But if applied to libel or slander without further explanation, it is likely to be misleading, and when put as a qualification of the ruling asked hardly can fail to be so. The meaning which naturally would be conveyed to the jury is, that, although a particular republication cannot be recovered for, damages may be enhanced by the general probability of unlawful republications. This is not the law. Wrongful acts of independent third persons, not actually intended by the defendant, are not regarded by the law as natural consequences of his wrong, and he is not bound to anticipate the general probability of such acts, any more than a particular act by this or that individual. *Hastings* v. *Stetson*, 126 Mass. 329, 331. *Shurtleff* v. *Parker*, 130 Mass. 293, 296. *Hayes* v. *Hyde Park*, 153 Mass. 514. *Leonard* v. *Allen*, 11 Cush. 241, 246.

*Exceptions sustained.*