WASHINGTON TIMES CO. v. BONNER.
No. 6253.

United States Court of Appeals for the
District of Columbia.

Decided Sept. 14, 1936.

Rehearing Denied Dec. 5, 1936.

Wilton J. Lambert, R. H. Yeatman, and William E. Leahy, all of Washington, D. C., and Manheim Rosenzweig, of New York City, for appellant.

Frank J. Hogan, John W. Guider, and Edmund L. Jones, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

STEPHENS; Associate Justice.

This is an appeal from a judgment of the Supreme Court of the District of Columbia [1] entered upon a verdict in favor of the appellee, F. E. Bonner, plaintiff below (hereafter called plaintiff), in the sum of $45,000. The suit was against the appellant, Washington Times Company, a corporation, defendant below (hereafter called defendant), for libel through newspaper articles. The questions presented on the appeal, stating them in general terms, have to do with alleged errors on the part of the trial court in respect of: Instructions to the jury, especially in relation to an asserted defense of qualified privilege and in relation to damages; rulings upon the admissibility of evidence; refusal to grant a motion for a new trial because of alleged interference with a juror, misconduct of counsel, undue restriction by the court of comment by counsel, and prejudice on the part of the jury.

It appears from the record that: The plaintiff, trained as a civil engineer, had devoted himself professionally especially to the field of hydro-electric power. For twenty years prior to 1929 he had been in the Forest Service of the United States Government, and during the latter part of that time had been assigned duties in connection with the work of the Federal Power Commission (hereafter called the Commission). In 1925 he had been considered for appointment as Executive Secretary of the Commission, and in 1929 he was again considered and was appointed to that post, vice O. C. Merrill, resigned. At that time, the Commission consisted of the Secretaries of War, Interior and Agriculture. These officials were primarily engaged in the duties of their respective departments; they held formal meetings of the Commission from time to time, and also consulted informally with the Executive Secretary, but in the large the actual work of the Commission was carried on by the Executive Secretary. He was at the head of a legal, engineering, and clerical staff. There was apparently some ill feeling and division of opinion among the employees of the Commission, both before and during the plaintiff's service as Executive Secretary, in respect particularly of the most effective method of carrying on the accounting work of the Commission, and in respect also of the manner of keeping files. In March, 1930, a Mrs. Minnie L. Ward, the Commission's file clerk, became irritated at Frank W. Griffith, the chief clerk of the Commission, and drove him out of her office—throwing water upon him and hitting him with eggs. For this she was suspended. Subsequently she filed charges with the Secretary of the Interior, as the then Acting Chairman of the Commission, the Attorney General, and the President, alleging that the plaintiff and Griffith had removed from the Commission's files letters written by various power companies recommending the plaintiff for appointment as Executive Secretary. At about this time there had been held hearings of the Senate Committee on Interstate Commerce in respect of alleged influence of private power companies on governmental activities, and not long before

---

[1] Now the District Court of the United States for the District of Columbia.

Public No. 796, 74th Congress, approved June 25, 1936 (49 Stat. 1921).

the episode of water and eggs, the plaintiff had testified at such a hearing that he was not aware of having been recommended for his appointment by power companies.

About a month after the episode of water and eggs and the filing of the charges by Mrs. Ward, the defendant published, beginning in April and ending in May, 1930, in various issues of its papers, the Washington Herald and the Washington Times, five articles charged by the plaintiff to be libelous. The first two were in identical terms but appeared in different issues of the same paper on the same day. They included pictures of the plaintiff, of Griffith, of Mrs. Ward, of the Secretary of the Interior, of two power company officials, and of an alleged lobbyist for the power companies, and contained also a cartoon of the egg throwing by Mrs. Ward, and a pungent rhyme in the style of "The House that Jack Built," with a moral attached advising honesty in public office. Captioning this matter was the title "ANGRY WOMAN THROWS SIX EGGS AND HITS POWER TRUST." A further caption, below the rhyme and moral, read, "Power Trust Keeps Government Employees Good Boys by Prospect of Promoting the Faithful to Good Jobs." Underneath this was a story-editorial expanding upon the rhyme and the moral. The three other articles were news stories, one captioned "MISSING POWER PAPERS FOUND," the second, "POWER AIDES MAY BE TRIED IN FILES CASE—Alleged Records Stripping to Be Studied by Rover [the then United States Attorney for the District of Columbia]; Bonner, Griffiths Named," and the third, "EGG BARRAGE KEEPS BONNER FROM PARLEY—Rifling of Power Commission Files Eliminates Secretary as Delegate to Berlin." In effect, the five articles asserted that: The plaintiff really ran the Commission; he had been "slipped" into his post as Executive Secretary through the influence of power companies, of which he was really the representative, and whose interests he was unlawfully promoting at the expense of the welfare of the country's power resources, this to advance his own pecuniary advantage in the future; he had abstracted from the files of the Commission letters from power companies recommending his appointment; in all of the respects above mentioned he had violated his duty as an officer of the United States, and in particular he was subject to possible criminal prosecution for rifling the files—some of the asserted letters had been discovered by the Department of Justice; due to the foregoing matters, or some of them, he had been eliminated as a delegate to the World Power Conference in Berlin for which he had previously been selected.

In December, 1930, the Commission was reorganized by a statute (16 U.S.C.A. § 792) which provided for a full-time officer personnel. The plaintiff was not employed by the new Commission. His private employment since the matters in issue has been sporadic.

The plaintiff's declaration alleged that: The plaintiff had at all times been a patriotic citizen and a civil engineer of good standing; the defendant maliciously published the articles complained of; the charges therein made were untrue; by virtue of publication of the articles, the plaintiff had been brought into disgrace, had been greatly injured in his name, reputation, business and profession, and had lost great gains that he otherwise would have made. At the outset the plaintiff prayed for both compensatory and punitive damages. The defendant entered pleas of general denial, truth, privilege, and want of malice, and pleas in mitigation of damages. At the opening of the trial, the plaintiff amended his declaration by eliminating therefrom the assertions of malice and the prayer for punitive damages. He also eliminated all but five counts [there were originally seventeen], which covered the five articles above described; and at the trial the first two counts, based upon the same article, were consolidated and treated as one. The eliminations reduced the issues of fact to questions of the truth of the charges and of actual damages. There was no dispute as to publication, and no dispute that the articles as phrased were libelous per se, i. e., actionable upon their face unless privileged. Under the instructions given, the plaintiff's verdict resolved the issue of truth against the defendant. There was a conflict of evidence on this issue, and no point is made on the appeal that the evidence thereon was insufficient to support the verdict. There were numerous witnesses and much documentary evidence, including depositions. The trial occupied substantially a month. The verdict in respect of the five counts on which the case was tried, was for the defendant on one count, for the plaintiff for $25,000 compensatory damages on the two counts consolidated, and for the plaintiff for $10,000 compensatory damages on each of the two remaining counts. After the verdict was entered, there was a motion

for a new trial, which the trial court overruled, and this appeal was then perfected. The assignment of errors includes sixty-nine points, but in the briefs on appeal only thirty-nine are relied upon. Thereunder are presented the following questions:

I. Did the trial court err in ruling that proof of truth of the charges made against the plaintiff was necessary for a verdict in the defendant's favor? The court so ruled in instructions given, and in refusing instructions requested including instructions requesting a directed verdict for the defendant on all counts. It is apparently the theory of the defendant that, malice and punitive damages being out of the case, it is as a matter of law immaterial whether the articles published were true or false. Defendant argues this theory of defense in part in terms of qualified privilege and in part in terms of fair comment. It urges a qualified privilege on the part of Mrs. Ward to prefer charges against the plaintiff, seemingly asserting her privilege in its own behalf; it also urges in its own right a privilege to report Mrs. Ward's charges and to make fair comment upon them and upon matters of public interest related to them.

 The law recognizes, under certain circumstances, a privilege, in the absence of malice, *i. e.*, a qualified privilege, to make defamatory statements against another even if false. Thus the statement of a master as to the character of a servant, made in good faith in answer to an inquiry by one contemplating employment of the servant, is privileged though untrue. Solow v. General Motors Truck Co. (C.C.A.) 64 F.(2d) 105, certiorari denied 290 U.S. 629, 54 S.Ct. 48, 78 L.Ed. 547. Likewise a charge of misconduct may be made with impunity to a proper official, if made in good faith, although it turns out to be false. Newell, Slander and Libel (4th Ed.) §§ 421, 422, pp. 445–448. Conceivably, therefore, if Mrs. Ward acted without malice, the charges against the plaintiff and Griffith filed by her with the Secretary of the Interior, the Attorney General and the President, were privileged, regardless of their truth. But Mrs. Ward is not a party to the case, and the defendant cannot stand directly upon a defense possibly available to her. Neither can the defendant in its own right avail itself of the qualified privilege mentioned. It made no charge to an official.

 Another qualified privilege recognized by the law is the privilege to publish reports of judicial proceedings, even though such proceedings contain false defamatory statements. Kimball v. Post Publishing Co., 199 Mass. 248, 85 N.E. 103, 19 L.R.A.(N.S.) 862, 127 Am.St.Rep. 492. Defendant cites no authority, and we know of none, extending this privilege to proceedings before an executive department or officer. Assuming, without deciding, that it can be so extended, and that the conditions of such a privilege would on the facts of the instant case be fulfilled,[2] such a privilege is not available to the defendant, because a comparison of the charges made by Mrs. Ward with the articles published by the defendant demonstrates that the defendant was not reporting the charges and any action thereon by the officers with whom she filed them. We print in the margin the more serious of Mrs. Ward's charges—those filed with the President.[3] The defendant's articles, especially those in rhyme which were the subject of the

---

[2] By the weight of authority the qualified privilege to publish reports of judicial proceedings does not arise until there has been official action by the magistrate or court in question. Cowley v. Pulsifer, 137 Mass. 392, 50 Am.Rep. 318, is representative of this viewpoint. The basis of the privilege, according to the majority rule, is the need of the public to know what its courts do, and therefore it is said that there is no justification for the report of the mere filing of papers or charges and that the privilege arises only when they are actually brought to the attention of the judicial officer and some action or hearing is had thereon. Newell, Slander and Libel (4th Ed.) § 450, pp. 487, 488. This limitation upon the privilege to report the contents of a complaint has, however, been rejected in New York and ignored in Pennsylvania. Campbell v. New York Evening Post, 245 N.Y. 320, 157 N.E. 153, 52 A.L.R. 1432; Mengel v. Reading Eagle Co., 241 Pa. 367, 88 A. 660. We do not decide whether the majority or minority rule should be followed in the District of Columbia.

[3] Before the President of the United States.

In the Matter of F. E. Bonner, Executive Secretary of the Federal Power Commission.

Charges and Specifications.

Your Orator, Minnie L. Ward, respectfully charges and specifies as follows:

Charge I. Violation of Section 37 of the Criminal Code of the United States [18 U.S.C.A. § 88].

Charge II. Violation of section 125 of the Criminal Code of the United States [18 U.S.C.A. § 231].

first two counts in the plaintiff's declaration, greatly enlarged upon and embellished Mrs. Ward's charges. Indeed, they amounted themselves to charges against the plaintiff to the public.

The law recognizes also, as a defense in defamation actions, a right of fair comment upon matters of public interest.[4] There is a division of authority, however, upon this subject. The courts in a few states hold that the right of fair comment on matters of public interest extends, in the absence of malice, to misstatements of fact. The leading case representative of that view

---

Charge III. Contempt of the Senate of the United States.

Specifications—Charge I.

Specification 1. In that F. E. Bonner, executive secretary of the Federal Power Commission, did on or about the latter part of the month of September, 1929, and at other times and places, conspire and confederate to and with *the* F. W. Griffith, chief clerk of the Federal Power Commission, to commit a crime against the United States [18 U.S.C.A. § 235] to wit, to violate section 129 of the Criminal Code of the United States, and thereafter the said Bonner and the said Griffith, in furtherance of the said conspiracy did unlawfully conceal, destroy, mutilate, take or carry away, certain public letters and documents belonging to the files of the Federal Power Commission, and in the custody and keeping of the said F. W. Griffith and the said F. E. Bonner. The said papers being particularly described as letters from the officials of certain power companies, recommending the said Bonner for the position of Executive Secretary of the Federal Power Commission, written in the year 1925; and certain other letters from the officials of certain power companies, recommending one Paul S. Clapp for the same position in 1925; and certain other letters and telegrams from the officials of certain power companies, written in 1929, recommending the said F. E. Bonner for the position of Executive Secretary of the Federal Power Commission.

Charge II.

Specification 1. In that F. E. Bonner, executive secretary of the Federal Power Commission, being before the Committee on Interstate Commerce, United States Senate, and under oath to tell the truth, did, on or about February 20, 1930, falsely testify that he did not know who recommended him for the position of Executive Secretary of the Federal Power Commission; that he did not ask the officials of any power company to endorse him for that position, and that he did not see any letters recommending him for the said position, all as more particularly set forth in the hearings before the said Committee, Part I, page 98 et seq., when the said Bonner had on or about June, 1929, called for, consulted, examined and looked over the application file of the Federal Power Commission, for the purpose of ascertaining who had recommended him in 1925, and the said Bonner thereafter, to wit, in September, 1929, again called for, consulted, examined and looked over the application file for the year 1925, and his own status file for the year 1929, which said file contained a considerable number of letters and telegrams recommending him for the said position. Wherefore, the said Bonner, being fully advised in the premises, knowingly committed perjury in his testimony before the said Committee on Interstate Commerce, United States Senate.

Charge III.

Specification 1. In that F. E. Bonner, executive secretary of the Federal Power Commission, knowingly, and with a deliberate and wicked intent to conceal the identity of his endorsers, and in wilful contempt of the United States Senate in a matter wherein he had taken an oath to tell the truth did testify, on or about February 20, 1930, that he did not know who had endorsed and recommended him for the position of executive secretary of the Federal Power Commission, all as more particularly set forth in the testimony before the said Committee on Interstate Commerce, United States Senate, at page 98, et seq.

Whereas, the said F. E. Bonner had during the month of June, 1929, informed himself as to the identity of his endorsers in 1925, and again in September of 1929, the said Bonner had consulted, examined and looked over the files containing letters endorsing him for the said position in 1925 and his own status file containing telegrams and letters endorsing him in 1929.

April 12, 1930.

[4] This is sometimes called a branch of qualified privilege, but whether it can properly be so called depends upon which of two lines of authority in respect of fair comment is said to represent the law. These are discussed in the text, *infra*. If the majority rule, which we herein follow, is adopted, fair comment cannot be spoken of as a branch of qualified privilege because, under that rule, the facts asserted as the predicate of the fair comment must be true, whereas under qualified privilege, they need not be true.

842

is Coleman v. MacLennan, 78 Kan. 711, 98 P. 281, 20 L.R.A.(N.S.) 361, 130 Am.St.Rep. 390. Other cases to the same effect are: Mulderig v. Wilkes-Barre Times, 215 Pa. 470, 64 A. 636, 114 Am.St.Rep. 967; Bays v. Hunt, 60 Iowa 251, 14 N.W. 785; Ross v. Ward, 14 S.D. 240, 85 N.W. 182, 86 Am. St.Rep. 746. An annotation in L.R.A.1918E, pp. 68 *et seq.,* discusses the minority rule. The theory underlying that view seems to be that free press discussion of matters of public interest is so important to the public that there should be no restriction upon newspaper statements except good faith in making them, *i. e.,* honest belief in their truth, regardless of their actual verity— that it is better to expose individual reputation to misstatement than to lay any restriction, except an absence of malice, upon public discussion.

But the great weight of authority in the state courts, and the rule in the Federal courts, is to the contrary—that the right of fair comment does not extend to misstatements of fact. More than a score of the state courts take this view. See L.R.A. 1918E, pp. 54 *et seq.* The leading case in the state courts for the majority view is Burt v. Advertiser Newspaper Co., 154 Mass. 238, 28 N.E. 1, 13 L.R.A. 97. There the defendant's newspaper articles charged the plaintiff with fraud in the conduct of his duties at the New York Custom House. The trial court had ruled that the publication was not privileged if the statements made therein were false, however reasonable the defendant's belief in their truth. This view the Supreme Judicial Court of Massachusetts held correct. The opinion was by Judge Oliver Wendell Holmes, who said:

"But there is an important distinction to be noticed between the so called privilege of fair criticism upon matters of public interest, and the privilege existing in the case, for instance, of answers to inquiries about the character of a servant. In the latter case, a *bona fide* statement not in excess of the occasion is privileged, although it turns out to be false. In the former, what is privileged, if that is the proper term, is criticism, not statement, and however it might be if a person merely quoted or referred to a statement as made by others, and gave it no new sanction, if he takes upon himself in his own person to allege facts otherwise libellous, he will not be privileged if those facts are not true. The reason for the distinction lies in the different nature and degree of the exigency and of the damage in the two cases. In these, as in many other instances, the law has to draw a line between conflicting interests, both intrinsically meritorious. When private inquiries are made about a private person, a servant, for example, it is often impossible to answer them properly without stating facts, and those who settled the law thought it more important to preserve a reasonable freedom in giving necessary information than to insure people against occasional unintended injustice, confined as it generally is to one or two persons. But what the interest of private citizens in public matters requires is freedom of discussion rather than of statement. Moreover, the statements about such matters which come before the courts are generally public statements, where the harm done by a falsehood is much greater than in the other case. If one private citizen wrote to another that a high official had taken a bribe, no one would think good faith a sufficient answer to an action. He stands no better, certainly, when he publishes his writing to the world through a newspaper, and the newspaper itself stands no better than the writer." [154 Mass. 238, at pages 242, 243, 28 N.E. 1, 4, 13 L.R.A. 97]

In the Federal courts the leading case is Post Pub. Co. v. Hallam (C.C.A.) 59 F. 530. In that case a newspaper article published by the defendant insinuated that the plaintiff, a candidate for public office, had received a money consideration for using his influence to procure the nomination of his rival. The United States District Court for the Southern District of Ohio had at the trial instructed the jury in substance and effect that:

"the public acts of public men (and candidates for office were public men) could be lawfully made the subject of comment and criticism, not only by the press, but also by all members of the public, for the press had no higher rights than the individual; but that while criticism and comment, however severe, if in good faith, were privileged, false allegations of fact, as, for instance, that the candidate had committed disgraceful acts, were not privileged, and that, if the charges were false, good faith and probable cause were no defense . . ." [59 F. 530, at page 539]

This instruction was held correct by the Circuit Court of Appeals for the Sixth Circuit in an opinion written by then Circuit Judge Taft:

"The existence and extent of privilege in communications are determined by balancing the needs and good of society against the right of an individual to enjoy a good reputation when he has done nothing which ought to injure it. The privilege should always cease where the sacrifice of the individual right becomes so great that the public good to be derived from it is outweighed. Where conditional privilege is extended to cover a statement of disgraceful fact to a master concerning a servant or one applying for service, the privilege covers a bona fide statement, on reasonable ground, to the master only, and the injury done to the servant's reputation is with the master only. This is the extent·of the sacrifice which the rule compels the servant to suffer in what was thought to be, when the rule became law, a most important interest of society. But, if the privilege is to extend to cases like that at bar, then a man who offers himself as a candidate must submit uncomplainingly to the loss of his reputation, not with a single person or a small class of persons, but with every member of the public, whenever an untrue charge of disgraceful conduct is made against him, if only his accuser honestly believes the charge upon reasonable ground. We think that not only is such a sacrifice not required of every one who consents to become a candidate for office, but that to sanction such a doctrine would do the public more harm than good.

"We are aware that public officers and candidates for public office are often corrupt, when it is impossible to make legal proof thereof, and of course it would be well if the public could be given to know, in such a case, what lies hidden by concealment and perjury from judicial investigation. But the danger that honorable and worthy men may be driven from politics and public service by allowing too great latitude in attacks upon their characters outweighs any benefit that might occasionally accrue to the public from charges of corruption that are true in fact, but are incapable of legal proof. The freedom of the press is not in danger from the enforcement of the rule we uphold. No one reading the newspaper of the present day can be impressed with the idea that statements of fact concerning public men, and charges against them, are unduly guarded or restricted; and yet the rule complained of is the law in many of the states of the Union and in England." [59 F. 530, at pages 540, 541]

See, also, representative of the Federal rule, Nevada State Journal.Pub. Co. v. Henderson (C.C.A.) 294 F. 60, certiorari denied 264 U.S. 591, 44 S.Ct. 404, 68 L.Ed. 865.

In Russel v. Washington Post Co., 31 App.D.C. 277, 14 Ann.Cas. 820, and in Ashford v. Evening Star Newspaper Co., 41 App.D.C. 395, we quoted with approval from cases representing the majority rule, and in A. S. Abell Co. v. Ingham, 43 App.D.C. 582, we applied it. But in the last case the contrary view was not seriously urged, and we did not discuss the authorities; hence we have in the instant case considered the question anew and have examined with care the leading cases, including those cited by the defendant, and we feel constrained to follow the majority rule as the better view. It follows that we must sustain the rulings of the trial court assigned as error in this aspect of the present case.

II. Did the trial court erroneously instruct the jury on the question of damages? The court told the jury:

"If you find for the plaintiff, you should render your verdict separately on each count treating Counts 1 and 2 as one Count, in respect of which you so find, in such sum as in your sound judgment you find will fully and fairly compensate him for the injury done to his reputation by the tendency of such publication to bring him into disgrace and disrepute among those who knew him personally or by reputation where the defendant's newspapers were published and circulated, and also on account of its tendency to expose him to public ridicule, disgrace, contempt or hatred, and to injure him in the pursuit of his livelihood as an engineer." [Plaintiff's Requested Instruction No. 10]

The court also instructed the jury:

"The jury are instructed as matter of law that there is no evidence in this case that the plaintiff either lost his position as Executive Secretary of the Federal Power Commission or was not reappointed to said position by reason of the publication of any of the articles complained of herein. They are, therefore, instructed that should they find for the plaintiff, they shall not award to the plaintiff any damages for loss of his position, as the defendant has not been shown to be in any way responsible therefor." [Defendant's Prayer No. 8, as modified by the court]

But the court had modified the defendant's prayer by·eliminating therefrom language

which would have forbidden the jury to allow damages for "subsequent unemployment."

The defendant urges error in several particulars:

■■■ (1) The first contention is that in giving plaintiff's requested instruction No. 10, the court told the jury that as a matter of law the plaintiff had to some extent been damaged, whereas the jury should have been required to find, first, whether he had been damaged at all, and if at all, then how much. In effect the complaint is that the words "if any" should have been used in the instruction after the word "tendency." We think the point not meritorious. It is conceded in the case, as above pointed out, that the articles published were libelous *per se*. It is elementary that in such event special damages need neither be alleged ·nor proved. The law presumes some damage. Norfolk & Washington Steamboat Co. v. Davis, 12 App.D.C. 306. Therefore, unless the defendant proved truth to the satisfaction of the jury, the plaintiff was entitled to at least nominal damages. Moreover, in respect of anything more than nominal damages, under the instructions as a whole the jury were informed that they must themselves find damages before awarding them. At one point the court told the jury, in part quoting from an instruction requested by the plaintiff:

"'. . . If you find from the evidence that the articles set forth in the counts of the declaration submitted to you, insofar as they refer to the plaintiff, Mr. Bonner, are false, and that the ordinary reader of said articles would construe them as charging Mr. Bonner with the commission of a crime or with being guilty of conduct which would hold him up to public contempt, ridicule, hatred or disgrace, then he is entitled to be fully compensated for the damages *which you may find he has sustained* or may sustain in the future as a result of these publications.'

"Now, you will see that exemplary damages are entirely taken out of the case, and you are to consider only actual damages . . ." [Italics supplied]

Again, the court said to the jury:
"You must use your own sound judgment and discretion. You can only award what you find to be fair compensation for the injuries *which you find* have resulted or will result directly from the tendency of the articles to bring about the injuries complained of." [Italics supplied]

■■■ (2) The defendant next asserts: The plaintiff's suit was not predicated upon publication of words actionable *per se* because tending to prejudice him in his occupation or employment as such; it was pleaded upon words actionable *per se* because tending to bring him into hatred, ridicule, or disgrace, and because charging him with a crime—the violation of a Federal statute forbidding removal, concealment or destruction of a public record;[5] therefore, the plaintiff is not entitled to damages for injury in his occupation or employment. This, also, is without merit. It does not follow from the fact that the plaintiff did not predicate his action upon words libelous *per se* because tending to prejudice him in his occupation or employment as such, that he is not entitled to damages for injury in his occupation or employment, if such injury, under the evidence, proximately resulted from such words as were used.[6] The defendant's point of view assumes that words which charge a crime and which bring a plaintiff into hatred, ridicule and disgrace, as a matter of law may not be a predicate for damages for injury to a plaintiff in his profession even though they actually do injure him therein. We know of no authority, and none is cited, which so restricts the right to damages. In Palmer v. Mahin (C. C.A.) 120 F. 737, where newspaper articles charged the plaintiff with blackmailing and the crime of extortion and embezzlement and, according to the court, tended to expose him to public hatred and contempt, the court, holding the words libelous *per se,* ruled as follows on the topic of damages:

"The unprivileged publication, in writing or print, of a false charge that another is guilty of a crime, or of a false charge which tends to expose another to public hatred or contempt, entitles the person thus defamed to recover of the publisher full

---

[5] Criminal Code, § 129, 35 Stat. 1112 (18 U.S.C.A. § 235).

[6] It is to be noted that, although the plaintiff did not declare upon words libelous *per se* because they tended to prejudice him in his occupation or employ- ment as such, he did, as pointed out at the outset of this opinion, aver that he had been greatly injured in his business and profession, and had lost great gains that he otherwise would have made.

compensation in damages for all the injury to his reputation, *business,* and feelings which the defamatory publication caused." [Italics supplied] [120 F. 737, at page 741]

See, also, Washington Times Co. v. Downey, 26 App.D.C. 258, 6 Ann.Cas. 765.

■ (3) The defendant asserts there was no evidence that the plaintiff was injured in his occupation or employment either in respect of his standing therein—the plaintiff was not engaged in his profession as an engineer, so the defendant contends, at the time of the publication of the articles in question—or in respect of lack of employment. We think this point of view not supported by the record. It is true that there was no testimony in terms that the plaintiff's standing in his profession had been injured by publication of the articles; but the plaintiff was not restricted to proof by such testimony. He had a right to rely on inferences fairly to be drawn from the evidence. And we are unable to say that the jury might not properly infer from the character of the charges admittedly made against the plaintiff that he was injured in his standing in his profession. Indeed, it would seem hardly possible for the jury to draw a contrary inference. It is not warranted to say that the plaintiff was not engaged in his profession as an engineer at the time of the publication of the articles. The practice of the profession of engineering is not limited to field work; executive activities directly related to the profession are also embraced. So far as evidence of the plaintiff's having been caused to be unemployed by the articles published is concerned, while, again, there was no testimony in terms that he had lost opportunity for a particular position,[7] there was evidence that he had been only sporadically employed since the termination of his services as Executive Secretary. Moreover, there was evidence that the plaintiff had specialized in hydro-electric engineering. His employment up to the time of the matters in suit had been wholly governmental. The nature of his governmental duties since he had been in Commission work, necessarily brought him into professional acquaintanceship, outside of the Government, largely with those engaged in power activities, for the most part municipal corporations and private corporations. We think that these circumstances, shown by the record, are basis for an inference that the market for the plaintiff's professional services had been, and would be, hurt.

■ (4) But the defendant contends finally, under the topic of damages, that the plaintiff is not entitled to damages for possible future unemployment. This is contrary to the authorities. In Newell, Slander and Libel (4th Ed.) § 729, pp. 819, 820, the author states:

"The jury must assess the damages once for all; no fresh action can be brought for any subsequent damage, except, perhaps, in some cases where the words are not actionable in themselves. They should, therefore, in making up their verdict, take into consideration not only the damage that has accrued, but also such damage, if any, as will arise from the defamatory words in the future."

In Steamboat Co. v. Davis, *supra,* 12 App. D.C. 306, where question was raised as to the correctness of instructions on damages, we held that:

"where the libel is actionable without the averment of special damages, the jury may take into consideration not only the injury that has arisen, but that which may thereafter arise from the publication of the libel. . . . This is because no subsequently accruing injury from the libel would afford a new ground of action to the plaintiff." [12 App.D.C. 306, at page 332]

III. Did the trial court rule correctly upon the admissibility of evidence?

■ (1) The court admitted in evidence nine letters and a memorandum produced as all in the file of the Commission in the Department of Agriculture, for the years 1925 and 1929, relating to the appointment of the Executive Secretary of the Commission. The memorandum was signed by the head of the Department of Farm Engineering and was in the nature of a biographical statement, containing laudatory comment, concerning the plaintiff. The other items, except one which was a mere acknowledgment of receipt of a letter, were laudatory letters recommending the plaintiff as qualified for the post of Executive Secretary of the Commission. Several were written directly to the Secretary of Agriculture. They were signed by various persons, including Major General H. Taylor—Chief of Engineers, Congressman Scott Leavitt, several officers of engineering societies, and one engineering

---

[7] The trial court had withdrawn from the jury consideration of damages for loss of the position of Executive Secretary. Defendant's Prayer No. 8, *supra.*

society as such. They were objected to by the defendant as irrelevant and hearsay. We think they were relevant regardless of the truth of their contents. One of the important questions in the case, under the defendant's plea of truth, was whether the plaintiff had been appointed Executive Secretary of the Commission upon the recommendation of power companies. The plaintiff denied this. He testified that there were no power company letters in the Commission's files except one from George H. Harries, vice president of the Byllesby Engineering & Management Corporation, whom he said he did not know, and another from Paul M. Downing, vice president of the Pacific Gas and Electric Corporation. The plaintiff was entitled to prove that the Commission, in selecting him, was actuated by representations as to his ability from non-power company sources, and the presence in the files of such representations was, regardless of their truth, some evidence of that. It is not entirely clear from the record that the jury was made definitely to understand that the exhibits in question were not received as evidence of the truth of the statements therein contained.[8] But if, on that account, there is technical basis for objection that the items were hearsay, the error was harmless. Most of the items had already been placed before the jury by the plaintiff, without objection by the defendant, in the form of letters addressed to the Secretary of War and to the Secretary of the Interior and to the Commission as such. Moreover, we cannot properly conclude that the effect of these exhibits upon the jury must have been so serious as to influence its verdict upon the whole of the case.

(2) The trial court excluded evidence, offered by the defendant, of speeches on the floor of the Senate relating to the plaintiff and to the Ward charges and to the affairs of the Commission, and evidence of two articles, printed in other newspapers, commenting upon the Ward charges and upon the affairs of the Commission, including, in respect of alleged "padded" accounts of power companies, its accounting system. These speeches and articles antedated the publication of the articles in the instant case. They are asserted by the defendant to have been admissible as showing that the subject of its publications was matter of public interest. The plaintiff did not object to the speeches and articles as incompetent, but only as immaterial. Assuming, without deciding, that it was for the jury rather than the court to determine whether the subject of the defendant's publications was matter of public interest, we think the excluded speeches and articles were material. They were some evidence of an actual public interest. But we do not understand that at any point in the case the plaintiff disputed that the subject of the defendant's articles was matter of public interest. The plaintiff was a public officer and the affairs of the Commission were public affairs, and it is doubtful whether anything more than those facts was necessary to show that a matter of public interest was involved. There was, however, in the record, a very substantial amount of evidence affirmatively showing that the subject in question was of public interest, for example, the evidence in detail describing the work of the Commission in respect of regulation of the use of the power resources of the country. The jury could not have failed to conclude that the subject of the defendant's articles was of public interest. The evidence offered and excluded was, therefore, cumulative. It was within the discretion of the trial court as to how much evidence on a particular subject ought to be a part of the record. We cannot conclude there was error in the court's exclusion of the evidence in question.

(3) The trial court sustained objections on the part of the plaintiff to questions asked in the defendant's behalf of the witness King, chief accountant of the Commission, as to whether the Commission's accounting system was similar to an ordinary bookkeeping system, as to whether the witness had been too meticulous in keeping the books (as thought by the plaintiff), and as

---

[8] The court instructed the jury:

"Reference has also been made by counsel to certain papers and documents which have been read in court. They contain, or some of them at least contain statements of other people who were not witnesses before you in this case. I am not now referring to statements made by Mr. Bonner himself, but the statements of others. Such statements, of course, are not evidence of the facts they contain. They are offered to show you the kind of papers which were being dealt with, or to show things that were going on, of which Mr. Bonner knew, and which it has been argued might be calculated to affect or explain his conduct or state of mind."

This warning to the jury is, it is to be noted, in general terms; it does not specifically refer to the exhibits under discussion.

to whether accepted public utility accounting principles had been followed. The trial court also sustained the plaintiff's objection to a question asked of the witness Green, assistant chief accountant and auditor engineer of the Commission, as to whether "farming out" the accounting work of the Commission was practical, and whether he knew of any official action by the Commission in respect of the matter of "farming out." Under the defense of truth, the defendant had sought to show, as supporting the charge that the plaintiff was a tool of power companies, that he had advisedly carried on the accounting work of the Commission in an inefficient manner, by "farming it out" in the Departments of War, Agriculture and Interior rather than by building up a large and efficient accounting force in the offices of the Commission itself. On the other hand, the position of the plaintiff was that the accounting system as organized was reasonably efficient, that funds were not available for the building of a large force, and that the supervisory force already available at the offices of the Commission, including King and Green, was sufficient, except for the fact that, over the plaintiff's protest, the force was wasting time and effort by over careful attention to inconsequential details. The testimony excluded was relevant, but it was cumulative. There was before the jury ample evidence on both sides of the dispute concerning the accounting system. It was made clear for the jury that the accounting was largely "farmed out" and why, and the views of both King and Green, on the one hand, and of the plaintiff and Col. Glen E. Edgerton, chief engineer of the Commission, on the other, as to the comparative efficiency of "farming it out," and of having it done by an augmented force of the Commission itself, were clearly before the jury. Moreover, there was evidence before the jury in some detail of the nature of the accounting system and of the manner in which the accounting was carried on. It was within the discretion of the trial court not to add to the record on the subject.

(4) It had been made to appear from the evidence that, in 1928, during the incumbency of the plaintiff's predecessor, Merrill, as Executive Secretary of the Commission, there had been sent to the House Committee on Interstate and Foreign Commerce a memorandum on organization, duties and status of the Commission, but that this was recalled for revision which eliminated certain portions, and then, as thus revised, was resubmitted as the official memorandum. After the plaintiff was appointed Executive Secretary, Senator LaFollette in writing requested a copy of "the first and original memorandum." Nevertheless, the plaintiff sent him a copy of the memorandum as revised, but without explanation that it had been revised. The plaintiff testified that he had sent the revised memorandum upon the direction of the Secretary of the Interior or his Administrative Assistant. Of this they disclaimed recollection. After the plaintiff sent the revised memorandum to Senator LaFollette, Merrill was called to testify at a hearing of a Senate committee, and he there apparently described the material eliminated from the first memorandum as relating to alleged "padding" of accounts by certain power companies, and also stated that this material was eliminated, as unfair to those companies, as a result of the insistence of those companies to the Secretary of the Interior. The plaintiff was present during this testimony by Merrill. During the trial of the instant case, counsel for the defendant sought on cross-examination to have the plaintiff answer the question, "What did he (Mr. Merrill) say?" To this the trial court sustained an objection. The defendant then offered to show what Merrill had stated, for the purpose of showing the attitude of mind of the plaintiff in respect of favoring power companies, as evidenced by his omission, after hearing Merrill's testimony, to notify Senator LaFollette that the memorandum sent him was not the first and original one. But the court again ruled against the question, as phrased.

The defendant's purpose to show the asserted attitude of mind of the plaintiff was, under the issue of truth, proper. But the ultimate ruling of the court did not forbid the accomplishment of the defendant's object. The court sustained the objection to the question only upon the ground that it was too broad, as calling for the whole of Merrill's testimony, and immediately ruled that the defendant had a right to probe the plaintiff's attitude of mind, provided the questions were particularized. The defendant did not take advantage of this invitation. The ruling of the court was properly within its discretion in keeping the record free of immaterial matters.

(5) Certain other rulings in respect of the admissibility of evidence are complained of by the defendant. We have considered them, but they are not, we think, worthy

of discussion herein. It is impossible to say from the record that they involve prejudicial error.

IV. Did the trial court err in denying defendant's motion for a new trial? The defendant urges each of the following as requiring an affirmative answer—interference with a juror, misconduct of counsel, undue restriction of comment by the defendant's counsel, and prejudice on the part of the jury.

(1) Toward the close of the trial one of the jurors was approached by an acquaintance who, after ascertaining that the juror was still on the jury and that the trial was still in progress, volunteered that he knew how he and the juror could make a lot of money. The juror immediately discontinued the conversation and left, and, at the first opportunity, gave an account of the incident to the clerk of the court and then to the trial judge. He communicated nothing of the episode to the other jurors, nor to any one except the clerk and the judge. By agreement of counsel, the judge called the juror into his chambers and with only the court reporter present took a statement of the episode, and examined the juror at length as to the possible effect thereof upon his mind. To the judge's question, in several forms put, whether the juror considered that the incident would prejudice his mind against either side in the case, the juror answered definitely in the negative. By further agreement of counsel, the judge explained to the juror that each side fully disclaimed any suspicion that the other had been connected in any manner with the making of the statement to the juror. The defendant requested a mistrial, which request was denied.

Whether a mistrial is to be declared or a new trial granted because of alleged misconduct of, or interference with, a juror, is a matter within the discretion of the trial court. Fullerton v. Government of the Canal Zone (C.C.A.) 8 F.(2d) 968; Kelly v. Moore, 22 App.D.C. 9, affirmed 196 U.S. 38, 25 S.Ct. 169, 49 L.Ed. 376. We cannot say that there was any abuse of discretion in the instant situation. On the contrary, it appears from the record that the trial judge acted with commendable care in assuring himself that there was no prejudice to either side in the juror's mind as a result of the episode.

(2) During the argument to the jury plaintiff's counsel said:

"Nobody can ever undo the wrong that was done to Frank Bonner. Bonner will never get into the White House again, and no members of the President's Cabinet will ever receive him in Washington—"
The defendant objected that this was not a matter of fact shown by the evidence, and moved to strike it out and also for a mistrial. The court indicated to the jury that the statement should not have been made, but denied the motion for a mistrial.

During the course of argument to the jury, the defendant's counsel commented upon asserted non-production of evidence by the plaintiff, and, as we point out below, the court struck this comment and ordered the jury to disregard it. At the same time, counsel for the plaintiff stated, "I defy you [defendant's counsel] now to put that Department of Justice file [alleged to contain power company recommendations of the plaintiff] in the record." The court struck this also from the record and admonished the jury to disregard it.

Further during the argument to the jury, counsel for the plaintiff commented that the defendant had secured to represent it at the trial leaders of the bar both locally and in Chicago. This the defendant objected to as not proper argument. The court struck out the comment.

Again during the argument, plaintiff's counsel commented that if the chief engineer of the Conowingo company's hydroelectric plant should die or resign, that company's officers would be disabled to employ the plaintiff in his place, notwithstanding the plaintiff's high competency, this because he had been charged by the defendant with being a tool of the power companies. This comment was objected to, seemingly on the ground that it was not supported by the evidence. The court, apparently upon the theory that the comment was but illustrative of the tendency of the publications in question, overruled the objection.

A trial judge who has heard comments of counsel and observed the jury at the time thereof is, from the practical standpoint, in a much better position than the appellate court to judge of their effect. Especially in a protracted trial, it is almost impossible not to have some things occur which might conceivably, as judged from a bare record, prejudice a jury. The granting or denying of a new trial is discretionary with the trial judge, and only in cases of abuse may an appellate court disturb his ruling. We cannot say from the record in

the instant case that the comments complained of must so plainly have prejudiced the jury that the trial judge abused his discretion in refusing a new trial.

(3) As indicated above, in the course of the argument to the jury counsel for the defendant commented that the plaintiff had not taken and offered in evidence the depositions of the power company officials who, according to the defendant, had written letters recommending the appointment of the plaintiff as Executive Secretary of the Commission—the purpose of this comment being to make it appear that the plaintiff feared such evidence. The trial court struck this comment, and in its final instructions told the jury to disregard it.[9] The propriety of drawing an adverse inference from the failure of a party to produce available evidence is, of course, well recognized. 1 Wigmore on Evidence (2d Ed.) § 285 *et seq.* In the instant situation, however, it was without dispute that the witnesses in question were not in court, and not in the District of Columbia; one was in New York, the others were elsewhere throughout the United States. Under such circumstances the weight of any inference from failure to produce testimony was so slight that even if the comment was technically proper we cannot attach prejudicial error to the rulings against it.

(4) When the verdict was first reported, it included the words "with costs." The court, over the defendant's objection, allowed the jury to retire to correct this. This it did by striking the words "with costs," leaving the amounts awarded on the various counts as they originally stood. The defendant asserts that the inclusion of costs in the verdict indicated passion and prejudice on the part of the jury. An examination of the record fails to disclose anything from which we can conclude that the jury was otherwise than simply confused as to its duty in this respect, so that the form of the verdict as originally brought in was a mere mistake on its part.

The amount of the verdict, $45,000, is urged by the defendant to be so excessive as of itself to show that the jury was influenced by passion and prejudice. It has been pointed out above that, in view of the instructions, the verdict against the defendant must be taken to have determined in the negative the issue of truth of the charges made against the plaintiff, and that no point is made on the appeal that the evidence was insufficient to support the verdict in that aspect. The jury, having decided that the charges made in the published articles were untrue, may have concluded, on the subject of injury and damages, that the charges, serious as they were, had gravely impaired for the plaintiff the two principal markets for his services as a civil engineer specializing in hydro-electric work, to wit, the Government and municipal or private power companies. The verdict is large, but a verdict almost as large ($40,000) was rendered and sustained in the First Circuit on an apparently similar defamatory publication concerning the plaintiff. New England Newspaper Pub. Co. v. Bonner (C.C.A.) 77 F.(2d) 915, certiorari denied 296 U.S. 610, 56 S.Ct. 128, 80 L.Ed. 433. In any event, we are not at liberty to reverse on account of the size of the verdict. The rule is settled in the Federal courts, not only in libel actions but also in general, that an appellate tribunal will not review the action of a trial court in granting or denying, for excessiveness or inadequacy of the verdict, a motion for a new trial. Press Pub. Co. v. Gillette (C.C.A.) 229 F. 108, certiorari denied 241 U.S. 661, 36 S.Ct. 448, 60 L.Ed. 1226; Fairmount Glass Works v. Coal Co., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439. In the case last mentioned where at a third trial the plaintiffs received a verdict for $1 and thereafter the Circuit Court of Appeals [59 F.(2d) 539] ordered a new trial unless the parties agreed to substitute $18,500 (or other agreed sum) for the $1 verdict, the Supreme Court reversed the Circuit Court of Appeals, saying, through Mr. Justice Brandeis:

"The rule that this Court will not review the action of a federal trial court in granting or denying a motion for a new trial for error of fact has been settled by a long and unbroken line of decisions; and has been frequently applied where the ground of the motion was that the damages awarded by the jury were excessive or were inadequate. The rule precludes likewise a review of such action by a circuit court of appeals." [287 U.S. 474, at 481, 53 S.Ct. 252, 254, 77 L.Ed. 439]

The judgment of the trial court is

Affirmed.

---

[9] The assignment of error for refusal of the trial court to grant a new trial on account of assertedly erroneous instructions is apparently intended to embrace this point.