DONOUGHE, APPELLEE, *v.* THE EAST OHIO GAS CO., APPELLANT, ET AL.

(No. 4086—Decided November 29, 1950.)

*Mr. Frank E. Steel* and *Mr. Ray J. McGowan,* for appellee.

*Messrs. Buckingham, Doolittle & Burroughs,* for appellant.

STEVENS, P. J. The amended petition of the plaintiff, filed in the trial court, alleged:

That the defendant The East Ohio Gas Company is

a corporation duly organized by virtue of law, and was at all times mentioned engaged as a public utility in furnishing gas for fuel and illuminating purposes to individuals, firms and corporations in Akron, Ohio.

That prior to January 24, 1942, the owner of the premises at 1752 West Market street in the city of Akron had caused to be installed, in the building known as "A-2" on said premises, a gas conversion heating unit; that said heating unit consisted of a Pacific coal boiler with conversion gas burners and various complicated electronic controls attached and connected therewith and thereto.

That said heating unit so installed was inherently defective, dangerous and unsafe, in that the type of boiler and the design and type of the gas burners and the attachments thereto did not provide enough air for the complete combustion of gas which flowed into said heating unit, and, as a result thereof, the unburned gas accumulated in said boiler and in said state was imminently dangerous and liable to explode.

That said heating unit and the controls attached thereto did not operate properly and were not adjusted properly and were defective in various respects.

That said inherently dangerous, defective and unsafe conditions of said heating unit continued to exist by, from and after the original installation of the same, and on down to and inclusive of the 24th day of January, 1947.

That the defendant gas company was notified on various dates of the defects of said heating unit and of the failure of said heating unit to operate in a proper manner, the exact dates of said notices to the defendant being unknown to plaintiff, but fully known to defendant.

That in pursuance of said notices, said defendant undertook to and did inspect said heating unit and

discovered the condition thereof, and negligently continued to furnish and supply gas to be used therein, and to permit and allow said heating unit, and the appliances connected therewith, to be used without remedying the defects, after having full knowledge of said defects.

That on January 24, 1947, at 3 p. m., plaintiff was employed by Westwood Manor, Inc., as a maintenance man in said premises; that he was directed to check said heating unit, and, being in ignorance of the danger then existing in and about said heating unit, he opened one of the doors thereof, with the result that there was a terrific explosion of the gas which had accumulated in said unit, and which was supplied by said defendant, as a consequence whereof plaintiff was seriously burned and injured.

That "the defendant was negligent in that it supplied gas to be used in the heating unit in question, at the time of the occurrence herein complained of on January 24, when it knew, or from its inspection should have known, that said heating unit was defective and unsafe."

That plaintiff's injuries were the direct and proximate result of the negligence of defendant above set forth, to his damage of $250,000.

For its answer, the defendant gas company admitted its corporate existence; that it was engaged in the sale and distribution of natural gas as a public utility; that it supplied gas to be used at the premises described in the petition; and that plaintiff sustained some physical injuries, the extent and character of which were unknown to defendant.

Defendant then denied generally the allegations of the petition not admitted, and prayed for the recovery of its costs.

Trial to a jury resulted in the return of a verdict

for plaintiff in the amount of $75,000 against the defendant gas company, the defendant Olmstead having been dismissed from the case at the end of plaintiff's testimony. Judgment accordingly was entered.

This appeal on questions of law followed, wherein appellant assigns the following errors:

1. In overruling the motion of appellant for a directed verdict and refusing to direct the jury to return a verdict in favor of defendant.

2. Error in the general charge of the court.

3. Error in refusing to charge the jury as requested by appellant.

4. Error in the admission of evidence objected to by appellant, and in excluding evidence offered by appellant.

5. The judgment is against the weight of the evidence and contrary to law.

6. Error in overruling defendant's motion for a new trial.

This being an action by plaintiff to recover for injuries alleged to have been sustained by him because of the claimed negligence of the defendant, it becomes necessary to ascertain what negligence was alleged, and what the proof thereof shows.

There is but one specification of negligence contained in plaintiff's amended petition, which is as set forth in full above.

The evidence as contained in the record discloses that, as one of several such installations, there was installed in the building designated as "A-2" in the Westgate property, a Pacific coal boiler. During the progress of construction of the Westgate project, gas was made available by the United States Government for use as fuel.

The owners of the project thereupon determined to use gas for heating purposes, and, in pursuance of

that determination, corresponded with defendant company. That correspondence appears as plaintiff's exhibits 1 to 24, attached to the record. It is the claim of both parties that those exhibits spell out the contractual obligation of defendant to the property owner, and the plaintiff's claim is that, from the contract thus created, and defendant's failure to perform said contract, arise the alleged acts of commission and omission which furnish the predicate for plaintiff's claim of defendant's negligence.

From these exhibits it appears that defendant advised the property owner (plaintiff's exhibit 8) that "the East Ohio Gas Co. will extend all gas mains in the streets to reach these apartment buildings. These extensions will be run at our own expense. You will be required to pay for a service line from the curb into each building."

On August 31, 1945, defendant wrote to the owners in part as follows (plaintiff's exhibit 14):

"The flue from the boiler to the chimney can be cut down from the size required for coal.

"Building A-2 * * *          16"
" * * *

"A draft tee with center baffle should be installed on each boiler flue.

"We, at the gas company, will furnish supervision on installing the burners, controls and flue. and the proper baffling.

"We will light and adjust the burners and check the automatic controls to be sure they are operating properly. We will set the drafts, run an Orsat test to determine the correct setting of the boiler burners for maximum efficiency. We will answer emergency complaints any time of the day or night. There is no charge for any of this service. In order to eliminate any chance of a misunderstanding, we will not replace parts, or clean the boilers or flues."

Thereafter, the owner decided to use, and purchased and had installed, John Zink upshot conversion burners, and Minneapolis-Honeywell dampers automatically controlled.

In due course, after the installation of the conversion burners and automatic controls, the burners were lighted and the installation placed in operation.

From the outset there was difficulty experienced, because of lack of sufficient air for efficient combustion, and numerous suggestions were made to overcome the difficulties.

On March 27, 1946, an inspection of the gas burners in the Westgate project was made by Mr. Wishart, of John Zink Company, Mr. Burke and Mr. Burkett, of The East Ohio Gas Company, Mr. Leon Psaty, one of the owners, and Samuel Jacobs, of the Jacobs Engineering Corporation, combustion engineers. As the result of that inspection, a report was made to Psaty & Fuhrman, Inc., the owner, in part as follows (plaintiff's exhibit 19-B):

"*Report on Boiler Room A-2*: On inspection we found that the automatic controls were in operation (gas controls and electronic). The boiler tubes showed deposits of carbon. The burners under operation showed a pressure in the fire box. At that time the gas rate was approximately 2200 C. F. H. The draft diverter was open and the air inlet to the fire box was wide open. On increasing the gas to 2400 C. F. H. a much greater pressure in the fire box resulted. After closing the diverter leaving but a small opening and closing down somewhat on the air supply, we found the following results: a negative pressure in the fire box, 8% $CO_2$ was found in the stack gases at a temperature of 375° indicated a combustion efficiency of approximately 77%. On shutting off the gas, no flash back was observed in the burners.

"* * *

"*Recommendations*:.

"No. 1: Draft adjusters should be installed on all breechings at once.

"No. 2. * * *

"No. 3. All burners and tubes that are carbonized or sooted should be cleaned. If any burners are damaged they should be replaced.

"No. 4. Adjustments for air and draft should be made on each boiler using $CO^2$ indicators, flue gas thermometers and draft gauges. Since the installation of the draft adjusters at this time is extremely important * * * we strongly feel that draft adjusters of any type that are obtainable at once, should be installed. * * * Consequently we have ordered for immediate expressage to the job, six such adjusters.

"* * *

"Jacobs Engineering Corp. By Samuel Jacobs."

Further correspondence ensued, which culminated in the letter of defendant to Mr. Nuovo, of Psaty & Fuhrman, on April 18, 1946 (plaintiff's exhibit 22), as follows:

"I visited Westgate Manor yesterday and met Mr. Jacobs who was working on the boiler in A-2 building. The Draft-O-Stat was installed, the air inlet door in front was connected to the lever arm on the automatic valve and, after adjusting both, the results showed a 375 degree stack with 7% $CO^2$. The burner operated and performed better than ever before, and there were no flashbacks on automatic control.

"We agree with Mr. Jacobs that all of the boilers should be connected up in a similar manner. We are burning 2400 cubic feet of gas per hour in the boiler. This is the first time it has been safe to use the correct input on this boiler.

"For the first time, I think we are getting good

combustion, and will get good results on the boilers with this type of installation. I am still of the opinion that there is too much heat in the boiler box for these burners to stand up for a long period of time. The burners will not burn out as often or as soon as they have in the past, but they will eventually burn out. Only time will tell us how long they will last.

"I think Mr. Jacobs will recommend, and we agree, that all the boilers should be cleaned of carbon, all burners cleaned and brick on top of burners replaced, if necessary, during the summer months."

From the date of this letter to the date of plaintiff's injury (January 24, 1947), there is no showing of other than a normal, uneventful operation of the heating appartus and the controls thereof.

On January 23, 1947, plaintiff, who was employed as a maintenance man at Westgate, was called to the office, and told that because the wife of Thomas Walsh had to go to the hospital on January 24, 1947, plaintiff would take Walsh's place in caring for the heating equipment on January 24, and that Walsh would show him how to care for it.

According to Donoughe, Walsh stated: "I don't know much about * * * [the furnaces] myself, but I will show you as much as I can."

Plaintiff stated that all Walsh told him was that if there was complaint about heat, to look at the aquastat (one of the automatic controls) to see that it was properly set, and to adjust the setting thereof, if necessary. Walsh also showed plaintiff how to turn the gas on by using the manual control button.

On January 24, plaintiff entered upon the discharge of his duties in charge of the heating apparatus at Westgate.

During the afternoon of that date, a tenant in one of the apartments heated by the boiler in building A-2,

complained that she had no heat. Donoughe investigated, and found the radiator in her apartment to be cold. He then went to the boiler room in building A-2, looked at the aquastat, which he found to be properly set, looked in the door of the boiler and observed that the pilot light was burning, but that the burners were not lighted.

He says he then took hold of the manual control button, turned the valve on, waited a moment, and when the burners did not light, turned the valve off. He then repeated the procedure.

When the burners did not light, plaintiff took hold of the chain which activated the secondary air damper. and started to pull it open, when there was a delayed combustion, or, as described by plaintiff, an "explosion"; which occurrence will hereinafter be designated as an "explosion." Plaintiff was thrown against the wall, and thereby sustained serious and disabling injuries. As a further result of the explosion, the flue pipe between the heating unit and the chimney was blown down, and the door on the automatic air damper was bulged outward so that it could not be closed.

A short time after the explosion, defendant's employees were called, went to the premises, tested for leaks in the gas lines, and found none, replaced the flue pipe, checked the automatic controls, lighted the burners, and the unit and controls worked in the conventional manner and without incident. However, the door of the automatic air damper, which was bulged outward as above stated, was blocked open, with a brick or bricks.

Under the allegation of negligence contained in the petition, it was incumbent upon plaintiff to show by a preponderance of the evidence that defendant was negligent in supplying gas to be used in the heating unit in question on January 24, 1947, when it knew, or from

its inspection should have known, that said heating unit and the controls thereof were defective and unsafe.

The furnishing of the gas by defendant to the heating unit in question at the time of the explosion is conceded, so we must address ourselves to the question of what the evidence shows the gas company knew, or, from any inspection which the evidence shows it to have made, should have known, of the alleged defective and unsafe condition of the heating unit and the controls thereof, at and before the time of the explosion.

The evidence is uncontroverted that, from April 18, 1946, to the moment of the explosion, the unit in question and the controls thereon operated normally and satisfactorily. No complaints to the defendant were made which would have furnished notice to defendant of a dangerous or defective condition of the unit or controls, nor is there a showing of facts from which such notice might be inferred.

"It is plain that the gas company was not an insurer against any and all damage which might result to a customer" (or its employee) "from the use of gas on the customer's premises. The bare fact of explosion * * * would not suffice to establish a dereliction of duty on the part of the gas company. Facts and circumstances must be shown which indicate a want of ordinary care on the part of the gas company, proximately causing the injury, or evidence of facts from which such want of due care might be inferred." *Northwestern Ohio Natural Gas Co.* v. *First Congregational Church of Toledo,* 126 Ohio St., 140, 153, 184 N. E., 512.

Plaintiff's witness Race testified that in his opinion as an expert in heating, the installation in building A-2 was not a proper installation because "no furnace

should be run with an automatic secondary air door on it without having other adequate air in case the door doesn't open—for a safety feature.''

It must be remembered that the defendant did not select or install the heating equipment or controls in question. The selection was made by the owners, and the installation by its contractor. Defendant had no authority to dictate the kind, size or type of equipment to be used, and under its agreement could only check the same during and after installation, for proper operation, and make such suggestions for improvement of operation as it deemed necessary. These owners needed not, and, as subsequent events proved, in some cases did not, follow defendant's suggestions and recommendations in that connection.

The testimony of the witness Race could not impose on the defendant any obligation other than those covered by the agreement of defendant with the property owner, because, in the absence of a contract to do more, the responsibility of the defendant terminated when it safely delivered its gas to the curb at the property in question, unless it actually knew, or from any inspection made by it or information brought to its notice should have known, of the existence of a dangerous or defective condition of the heating equipment or the controls thereof.

At the close of all the evidence, the court should have determined, as a matter of law, the question of the legal duty of the defendant in this case; instead of doing so, the court charged:

''While there is no duty on the defendant to inspect heating units, yet if the defendant company, through its employee or employees, had knowledge, or, after inspection, in the exercise of reasonable diligence, should have had knowledge, that the heating unit, into which the defendant company permitted gas to flow,

was defective and unsafe at the time of the occurrence herein complained of on January 24, 1947, in that some of the gas did not burn but accumulated in the heating unit due to improper facilities for combustion, and it is such information that would *suggest* to persons of ordinary care and prudence under the circumstances that the heating unit was unsafe, then the defendant company was under a duty to shut off the gas until the unsafe and defective condition could have been corrected.'' (Italics ours.)

This charge permitted the jury to find negligence as against the defendant if information in defendant's possession, or of which it should have had knowledge after inspection, even *suggested* "that the heating unit was unsafe."

Mere suggestion of negligence is not the degree of proof required to establish actionable negligence against defendant, but evidence establishing the greater probability of the truth of some act of commission or omission, with which defendant is charged, which proximately caused the injury and damage to complainant.

The portion of the charge above set forth was erroneous, and prejudicially so, because it permitted an improper quantum of proof to establish defendant's negligence.

But entirely aside from the foregoing, under the terms of the agreement of the defendant with the owner, as set out in plaintiff's exhibit 14, we are unanimously of the opinion that plaintiff's evidence completely failed to show (1) the existence of a dangerous and defective condition of the heating equipment and the controls thereof, and (2) knowledge of the defendant of the existence of such alleged dangerous and defective condition, even assuming such condition did exist.

In the light of those conclusions, we are further of the opinion that the trial court erred to the prejudice of defendant when it overruled appellant's motion for a directed verdict, made at the conclusion of all the evidence.

As to the other errors assigned, we do not deem a discussion thereof necessary, but will merely state our conclusions thereon.

There was prejudicial error in the charge of the court on the subject of the duty of the defendant to inspect the equipment in question, when the court charged: "If you do not find knowledge such as is gained actually, or that should have been gained by reasonable diligence through inspection, * * * your verdict will be for defendant * * *."

The law did not impose, and the contract of defendant with the owner did not provide for, the assumption by defendant of a duty to inspect the equipment and the controls thereof.

What the court should have said, was that, if defendant be found to have inspected the heating unit and the controls thereof, then defendant was bound to take notice of the conditions reasonably disclosed by that inspection, and to take such action as would have been taken by a reasonably prudent public gas utility company under the same or similar circumstances.

There was prejudicial error in the refusal of the trial court to give defendant's special request to charge before argument No. 4, as follows:

"Defendant The East Ohio Gas Co. has no right to dictate to its consumers the type or character of gas-consuming equipment they shall use or how they shall install it or by whom it shall be operated, or how it shall be operated."

The subject matter of that charge was proper, pertinent and important, and not cumulative of defendant's request No. 2, as asserted by appellee.

We think it was error to admit evidence of the condition of the equipment and controls in question at a time almost nine months before plaintiff's injury. The only possible basis for plaintiff's recovery was upon a showing of a defective and dangerous condition of said equipment and controls at and immediately before the time of plaintiff's injury, of which condition defendant had actual or constructive notice, and which proximately caused plaintiff's injury.

We are further of the opinion that the evidence contained in this record shows that plaintiff's injuries were caused solely by his own conduct, in twice injecting gas into the boiler, and then opening the automatic air damper, and that no negligence of the defendant contributed thereto.

From the foregoing, we conclude that there was no issue properly submissible to the jury, and that the trial court should have entered judgment for defendant at the conclusion of all the evidence; and, having failed to so do, it is the duty of this court to reverse the judgment, and to enter final judgment for appellant, with exceptions to appellee.

*Reversed and final judgment for appellant.*

HUNSICKER and DOYLE, JJ., concur.