**WASHINGTON GAS LIGHT CO.**

v.

**CONNOLLY et al.**

**No. 11741.**

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 17, 1954.

Decided May 13, 1954.

Keech, District Judge, dissented.

Mr. John J. Wilson, Washington, D. C., with whom Messrs. Roger J. Whiteford, W. E. Gallagher, and Duane G. Derrick, Washington, D. C., were on the brief, for appellant.

Mr. William T. Hannan, Washington, D. C., with whom Mr. Ralph F. Berlow, Washington, D. C., was on the brief, for appellees. Mr. William H. Clarke, Washington, D. C., also entered an appearance for appellee Westchester Fire Ins. Co. of New York.

Before EDGERTON and FAHY, Circuit Judges, and RICHMOND B. KEECH, District Judge sitting by designation.

FAHY, Circuit Judge.

The Washington Gas Light Company appeals from a judgment of the District Court, based on a jury verdict, in favor of appellee Aloysius J. Connolly in the sum of $12,000, and in favor of appellee Westchester Fire Insurance Company of New York in the sum of $6,000. The judgment grew out of an action by Connolly and the Insurance Company against the Gas Light Company to recover damages caused by a fire alleged to have been due to the negligence of the Gas Light Company. Under a policy covering the premises where the fire occurred, owned by Connolly, the Insurance Company paid him $6,000 and to that extent was subrogated to his claim against the Gas Light Company.

At all times material Connolly was a doctor with professional offices in the basement of the premises, no other part of which was occupied at the time. Sometime during the night of December 6 or early morning of December 7, 1949, a fire broke out in this basement and caused substantial damage to the premises and to personal property therein including the doctor's professional equipment.

An automatic gas furnace was located in one of the basement rooms. The complaint alleged that employees of the Gas Light Company performed certain work on this furnace and its appliances in a negligent and careless manner, resulting in the fire.

A somewhat lengthy trial was vigorously contested, both as to liability and damage. The Gas Light Company sought exoneration by the court at the conclusion of plaintiffs' case, at the conclusion of all the evidence, and again after the verdict, but in each instance the court ruled the issue of liability to be one for the jury.

■ We agree. The heating plant and appliances were not installed by the Gas Light Company and it was under no general obligation to maintain them in good condition. But about a week previous to the fire it undertook, at the doctor's request, to put the furnace in operation. And the afternoon before the fire, again at his request, it undertook to remedy a "no heat" situation complained of by the doctor. The performance of this work gave rise to a legal obligation on the part of the Gas Light Company to exercise due care in its execution. Washington Gas Light Co. v. Biancaniello, 87 U.S. App.D.C. 164, 183 F.2d 982; Skelly Oil Co. v. Holloway, 8 Cir., 171 F.2d 670, 674. We do not read Donoughe v. East Ohio Gas Co., 89 Ohio App. 411, 102 N.E.2d 881, relied on by the Gas Light Company, as laying down a different rule. The court below correctly described this obligation to the jury, as follows,

"* * * that degree of care necessary under the circumstances in repairing or in examining the condition of the heating system * * * [I]t was bound to exercise such care, skill and diligence in all its operations, and in the transaction of all its business, as the difficulty or danger thereof required. All precautions of

safety must be taken within the bounds of reason in repairing and caring for gas appliances * * *."

■ There is a dispute as to the sufficiency of evidence to warrant the court in submitting to the jury the question whether the work undertaken by the Gas Light Company was performed with this requisite care and, if not, was the proximate cause of the fire. We think the evidence was sufficient, having in mind that we must now view the evidence on this question in the light most favorable to the appellees. Higashi v. Shifflett, 90 U. S.App.D.C. 302, 195 F.2d 784, and cases there cited. Credible testimony was introduced that servicemen from the Gas Light Company would start the doctor's furnace each fall; that on such calls the Gas Light Company made it a practice to check the furnace controls; that such a check was recorded as having been made the week prior to the fire; and that at the time of the fire the operation of each of the automatic safety controls over the flow of gas into the burners was defective. All the evidence material to the issue of negligence was controverted, but its resolution was for the jury.

As to proximate cause there was a dispute whether the fire had its origin in the furnace. The Gas Light Company sought to convince the jury the fire was due to ignition by defective electric wiring of quantities of paint and other possibly inflammatory material on the premises. But there was substantial evidence of the fire's intensity in the immediate vicinity of the furnace, and of the condition of the furnace and its surroundings, from which the jury reasonably could conclude that the furnace was the source of the fire. On the issues both of negligence and proximate cause and, therefore, of liability, we find no prejudicial error in the submission of the case to the jury.[1]

We come now to the damage. The part of the judgment awarding $6,000 to the Insurance Company will be affirmed, subject to the condition hereinafter stated. The evidence is altogether sufficient to support recovery of this amount for damage to the building.

■ We set aside, however, the award of $12,000 to appellee Connolly and remand the question of amount, though not that of liability, for a new trial. It is well settled that we may thus divide the issues and limit the scope of a new trial. Thompson v. Camp, 6 Cir., 167 F.2d 733; May Department Stores Co. v. Bell, 8 Cir., 61 F.2d 830, 842–843; Farrar v. Wheeler, 1 Cir., 145 F. 482, 486, on rehearing; see, also, Kraft v. Lowe, Mun. App.D.C., 77 A.2d 554, 558; Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 497, 51 S.Ct. 513, 75 L.Ed. 1188; Furr v. Herzmark, 92 U.S.App. D.C. 350, 206 F.2d 468; 28 U.S.C. § 2106 (Supp.1952).

■ Two circumstances impel us to set aside this part of the judgment. In an inventory of losses admitted in evidence, plaintiff valued a diathermy at $750. His testimony, though somewhat unclear, we think must have been understood by the jury as meaning that this article was purchased new by him. The Gas Light Company accompanied its motion for a new trial with an affidavit, which is quite convincing, that the machine was not new but secondhand when purchased by Connolly, and cost him only $244.80. It might be that the doctor's testimony was intended to indicate $750 as the value of a new instrument of this character rather than of the one he had, but it is unlikely the jury would so have understood. We would hesitate to disturb, on this basis alone, the discretion of the trial judge in denying the motion for a new trial; but this incident must

1. Other alleged errors bearing on liability have been considered. These include the refusal of the court in its discretion to reopen the case for additional evidence as to the water capacity of the boiler; the admission of the report of a laboratory inspection of the boiler controls prepared by Company employees, which we think was not erroneous, because the time and circumstances of preparation of the report went to its weight as evidence rather than its admissibility; and the instructions to the jury.

be viewed in the light of another. The doctor testified that the items listed in the inventory, totaling $7,814.50, contained the same figures as in his personal property tax returns.[2] Adding to the highest figure shown by the returns the value of property purchased after the date of the last return but before the fire, there remains a large discrepancy between values testified to and those shown by the returns.[3] Of course the latter might not have been correct. But these two incidents bearing upon the value of the personalty, without further explanation, and in the absence of independent evidence to justify the full amount, leave this part of the verdict with precarious support in the evidence. Perhaps neither of the discrepancies alone would be sufficient to require a new trial, but in combination they impel the conclusion that the total award for damages to personalty does not find support in the evidence. We see no satisfactory way of obtaining a determination of the proper amount other than by requiring a new trial of this part of the case.[4]

▮ Our disposition of the appeal above indicated must be conditioned as now explained. After the verdict the Company filed an affidavit to the effect that one of the jurors, Irene Martin, during the course of the trial asked the Company to have her furnace checked in circumstances which indicated she might have been obtaining independent information to assist her in reaching a verdict. In connection with its motion for a new trial, or for judgment notwithstanding the verdict, the Company sought opportunity to interrogate this juror, which was denied. We think this matter should have been inquired into by the court to determine if prejudice occurred. See Ryan v. United States, 89 U.S.App. D.C. 328, 191 F.2d 779, certiorari denied sub nom. Duncan v. United States, 342 U.S. 928, 72 S.Ct. 368, 96 L.Ed. 691; Washington Times Co. v. Bonner, 66 App. D.C. 280, 292, 86 F.2d 836, 848, 110 A.L. R. 393. The denial of a new trial in the former of these cases and of a mistrial in the latter was affirmed, but in each an inquiry had been made into the question of prejudice. In Orenberg v. Thecker, 79 U.S.App.D.C. 149, 143 F.2d 375, a new trial was also denied because of alleged misconduct of jurors but the case does not hold that a hearing would not have been proper to determine whether or not prejudice had occurred. See Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450. See, also, Middleton v. Kansas City Public Service Co., 348 Mo. 107, 152 S.W.2d 154. The question of prejudice and therefore of a new trial should await, on the facts of the present case, the result of the inquiry. A proper procedure, which we follow in so far as here applicable, is set forth in Remmer v. United States, supra, and in Wheaton v. United States, 8 Cir., 133 F.2d 522.

We accordingly will vacate the judgment and remand the case to the District Court with directions to set aside the order denying a new trial and to hear and determine the question of prejudice by reason of the alleged conduct of the juror Martin. If the District Court finds that prejudice occurred, then an entire new trial should be granted. If the contrary, judgment should be re-entered insofar as it fixes liability against the Company and determines $6,000 to be due to the Westchester Fire Insurance Company of New York, and a new trial awarded insofar as

---

2. The tax returns were allowed to be put in evidence by the Gas Light Company after the doctor's counsel had concluded his opening argument to the jury.

3. This situation prompted the Gas Light Company to request an instruction that if plaintiff or any witness had testified falsely about any matter concerning which he could not reasonably be mistaken the jury might disregard his entire testimony. The giving of such an in-

struction, at the time requested, was within the discretion of the trial court. See Carver v. Missouri-Kansas-Texas R. Co., 362 Mo. 897, 911–912, 245 S.W.2d 96, 102.

4. The trial of course may include also the claim for loss of income and for the amount of damages to the building, if any, over and above the $6,000 awarded to the Insurance Company.

it fixes the amount of damages to appellee Connolly at $12,000.

It is so ordered.

KEECH, District Judge (dissenting).

I would remand the case for entry of judgment for the defendant notwithstanding the verdict.

This action grows out of the burning of a building owned by plaintiff, in which he had his office as a physician. Plaintiff claimed damages for injury to the building, destruction of professional equipment, and loss of income. The plaintiff's contention was that the fire at his office was caused by overheating of a gas furnace, and that the overheating of the furnace resulted from negligence of the defendant Gas Company. Plaintiff's counsel disclaimed reliance on the doctrine of res ipsa loquitur. (A. 140) Starting with the premise that the defendant is not an insurer and plaintiff's disclaimer of reliance on the doctrine of res ipsa loquitur, plaintiff may prevail only if he can show specific negligence. Liability, if any, must be pitched upon the principle that defendant, having undertaken to do a certain job, was required to exercise reasonable care in performing it. Thus, if the defendant is to be held liable, plaintiff must prove four things: (1) that defendant undertook to do a particular job; (2) that defendant failed to do properly that which it undertook or, in doing that which it was requested to do, defendant observed or should have observed an obvious defect and failed to correct it or timely call it to plaintiff's attention; (3) that such failure was the proximate cause of the fire; and (4) that plaintiff sustained damages and the amount thereof. What did the plaintiff request the defendant to do? What did the defendant do, and in what manner? If the defendant did what it was requested or assumed to do and did it with reasonable care, plaintiff's cause must fail. What does the record disclose?

The gas furnace was neither purchased from nor installed by the defendant. There was no specific contract between plaintiff and defendant for repair or general inspection or maintenance of the furnace or attachments. The plaintiff each year called upon the gas company to turn the furnace on and off. The defendant sent its servicemen on November 29 and 30, 1949, in response to a call to turn on the furnace and again on December 6 in response to a call that the furnace was not heating.

Plaintiff's counsel enumerated the specific acts of negligence on which he relied. (A. 141) These acts were summarized as "failure of the gas company to check and service * * * [the furnace] controls when they had notice to when their practice was to service them, and they had not told the Doctor anything about it at all." Plaintiff relied particularly on the alleged failure of the serviceman who responded to the "no heat" complaint on December 6 to examine the thermostat, after plaintiff had stated to him that it would not turn on the furnace, and the admitted failure of the defendant to clean out the low water cut-off at any time. In support of his contention that the defendant was negligent in servicing the controls, plaintiff further relied on a laboratory report of an inspection of the dismantled controls in March, 1950, several months after the fire, as showing that three of the four controls would not *then* function properly, and the fact that the *fourth* control was the one which the serviceman had worked on the evening before the fire.

Considering in turn the acts of negligence relied on by plaintiff, the evidence, viewed in the light most favorable to the plaintiff, does not disclose any negligent failure of the defendant to check the controls, or failure to service the controls which it was their practice to service on the type of calls which defendant's employees made to plaintiff's furnace, nor does it disclose any obvious defect which defendant should have observed and corrected or reported to plaintiff.

The plaintiff testified that when the gas company employees turned on the furnace on November 29, 1949, the serviceman did all that had been done before in turning on the furnace in previous

years, omitting nothing. (A. 32, 42) On November 30 another serviceman responded to the same call to light the furnace and found it had already been done the day before. He checked the thermostat on and off, looked at the water level, and did no more. (A. 97)

On December 6 when plaintiff arrived at his office he found it cold. With the thermostat adjusted so as to call for heat, the furnace did not come on; and although plaintiff turned the dial back and forth, listening for the "click" the thermostat made whenever the furnace went on or off, he did not hear the click. He left the thermostat set at between 70° and 80°. He looked at the water gauge and found it normal, and then called the gas company and told them he had no heat. When the serviceman and his helper came, plaintiff told them of finding the house cold, trying the thermostat, and inspecting the water gauge. The serviceman proceeded to examine the pilot, took it apart and cleaned it with an air gun, told plaintiff the orifice had not been clear enough, and put the pilot back. The senior man told the younger man to turn up the flow of gas higher, and said that enough gas had not been getting through to make a sufficiently hot flame to light the elements which caused the burners to go on. The serviceman watched the furnace for five or ten minutes, then said it was working satisfactorily and that the problem had been taken care of, and left. The men did not go upstairs to check the thermostat. (A. 22, 23, 44) After they left the plaintiff did not hear the thermostat click again, but the place was just getting comfortably warm when he left the office. Plaintiff did not touch the thermostat after the men left. (A. 23, 43) When plaintiff returned at 8:30 the next morning the building was on fire, with the fire centered in the furnace room in the vicinity of the furnace.

As to the thermostat, assuming that plaintiff told the servicemen on the evening of December 6 that it was not "clicking" and they did not thereafter check the thermostat, they had no reason to do so, since the complaint was "no heat" and the furnace went on after they cleaned the pilot and continued to operate properly for five or ten minutes before they left. And assuming plaintiff did not hear the thermostat "click" off before he left the building, there was no occasion for the furnace to go off, as the office was just getting comfortably warm when he left. The thermostat was operating on November 29 and 30, and on December 6 the heat came on as soon as the pilot was cleaned.

The failure of the controls to operate over three months later, after they had all been through an intense fire and removed from the furnace was too remote to raise any inference as to their condition and operation on December 6. The laboratory report itself showed that the gas valve seat was locked in a closed position and the leather diaphragm of the regulator showed signs of drying, and there was uncontradicted testimony that the scale on the low water cut-off had undergone substantial chemical change. Although the report showed one circuit of the thermostat did not always function when it was examined in March, the thermostat had been removed from the wall some time before and when Inspector Bales examined it immediately after the fire its condition was such that he believed it was still working at the time of the fire. (A. 66, 72) The laboratory report of March, 1950, permitted only speculation by the jury as to the condition of the controls on December 6.

Plaintiff's case boils down to the facts that the defendant turned plaintiff's gas furnace on and off each year, that it adjusted the pilot the evening before the fire, that there was a fire centering in the vicinity of the furnace or flue pipe, and the conclusion that therefore the fire must have been caused by a defect in the furnace and the defect must have resulted from some negligence on the part of the gas company. With specific disclaimer by the plaintiff that he relied on res ipsa loquitur, the only premises on which the jury could find negligence on the part of the defendant was to hold either that whenever the gas company is called to

turn on a furnace, it has a duty to inspect the inner workings of all controls and to clean them out, including those which necessitate a disassembling of the furnace and even though a check of their operation shows them to be functioning properly, or that the gas company by answering calls to turn a furnace on and off assumes the duty to maintain and repair it.

I do not believe the gas company has any such obligations. In my view, reasonable care does not require the company, each time it is called upon merely to light a furnace, to disassemble it or dismantle parts of it in order to inspect the operation of the controls and clean them, when a check of their operation shows them to be functioning properly. I doubt that the average furnace owner would approve such procedure. Nor is it my view that by turning the gas on and off at the request of the owner the company assumes the duty to maintain and repair the furnace, a duty which is specifically placed upon the owner by regulation.

In view of the foregoing, I would hold that the case should not have been submitted to the jury and that the defendant was entitled to a directed verdict.

Assuming, arguendo, that there was sufficient evidence to raise issues for determination by the jury, I believe the case should be reversed and remanded for errors at the trial and because of information which came to light after the trial.

Unless defendant had a duty to maintain and repair plaintiff's furnace, evidence as to good practice in the maintenance of the furnace was irrelevant. There was no evidence that plaintiff engaged defendant to maintain the furnace and no evidence from which assumption by defendant of such duty could be inferred. The mere fact that plaintiff never had anyone else inspect or repair his furnace—a fact of which there is no evidence defendant had knowledge—would not place the duty of maintenance upon the defendant. Under these circumstances, admission of the statement from the Honeywell manual to the effect that it would be good practice to clean out the housing of the low water cut-off at least once a year, or more often as dictated by the condition of the boiler water, was error. This evidence was most prejudicial to the defendant, since the jury might reasonably conclude from its admission that it was relevant to the standard of care to be exercised by the defendant and that defendant had the duty to maintain the plaintiff's furnace in good repair.

The prejudice arising from admission of this statement from the Honeywell manual was increased by permitting plaintiff's counsel to argue to the jury that the duties of the gas company were "what they were told to do in *their own manual*" and that the defendant's servicemen admitted that it was good practice to clean out the housing at least once a year or oftener. Although in a colloquy with counsel at the bench the court recognized that the manual was not used by or controlling on the gas company and that the gas company had not undertaken to keep the system in repair, the record does not show that the erroneous impression already created by plaintiff's argument was corrected by any advice to the jury.

This prejudice was further heightened by exclusion of Order 3879 of the Public Utilities Commission of the District of Columbia, offered by defendant to show that, in the absence of assumption by defendant of the duty, plaintiff had the duty to maintain and repair his furnace. The order was relevant and competent on that issue.

Nor was the situation cured by the court's instructions to the jury. The court denied Defendant's Instruction No. 4 and, incorporating Plaintiff's Instruction No. 6, charged:

"Now in this case the plaintiff called upon the gas company to come and *examine the condition of a heating system in his house, and the defendant undertook to do so.* When it undertook to do so, it undertook through its employees to exercise that degree of care necessary under the circumstances *in repairing or in*

*examining the condition of the heating system* in the house of the plaintiff. When the defendant undertook to do that, it was bound to exercise such care, skill and diligence in all its operations, and in the transaction of all its business, as the difficulty or danger thereof required. All precautions of safety must be taken within the bounds of reason *in repairing and caring for gas appliances*; that is, the defendant gas company is under the obligation to exercise the care which a reasonably prudent person would exercise under similar circumstances, being charged with knowledge of the danger which might result to the premises, their contents, and the owner thereof, *if burning gas were allowed to flow unobstructed, uninterrupted, within the furnace.*

"Now the plaintiff claims that these employees of the defendant failed to exercise that degree of care; that they failed to properly inspect the various controls operating in this system; and *failed to notify the plaintiff if anything remained in disrepair or in any dangerous situation after they left.*

"The plaintiff claims they failed to properly inspect and regulate a thermostat which was one of the controls in this system; and they failed to properly inspect the low water control and other controls; and they failed to check or service other controls *when it was their practice in servicing this system to examine and service those controls.*"

The whole tenor of the court's charge was such as to give the jury the impression that the defendant had undertaken to repair and maintain plaintiff's gas furnace. The instruction infers that the defendant failed to service controls which it was the company's practice to service, although the evidence was to the contrary

and the plaintiff himself testified the servicemen did all they ever did when they lit the furnace on November 29. There were no facts in evidence warranting an instruction as to the servicemen's failure to notify the plaintiff "if anything remained in disrepair or in any dangerous situation after they left."

The court erred in admitting the laboratory report as to the condition of the boiler controls in March, 1950, in the absence of a showing that the condition then was substantially the same as on the evening of December 6, 1949, prior to the fire,[1] and in the face of uncontradicted evidence that in March they did not truly reflect their operating condition on December 6. Had there been other evidence as to the negligence of the defendant in servicing the controls or failure of the controls to turn off the flow of gas at the time of the fire, admission of the laboratory report might not have been reversible error. But, in view of the absence of any evidence of specific acts of negligence on the part of defendant and the inapplicability of the doctrine of res ipsa loquitur, the laboratory report must have constituted the principal basis of the jury's finding of negligence.

The prejudicial effect of the report was aggravated by language in the court's charge from which the jury might reasonably conclude that gas was permitted to flow unobstructed through the furnace, an inference to be drawn only from the laboratory findings as to the condition of the controls in March.

In my view, the court erred in denying the defendant's request for the usual charge that the jury might disregard all or any part of the testimony of any witness who it might believe had wilfully testified falsely. While it is true that the propriety of giving this instruction is generally a matter within the court's discretion,[2] here the plaintiff's own testimony amply warranted its inclusion in the charge. The sole evidence of the value

1. Altemus v. Talmadge, 61 App.D.C. 148, 58 F.2d 874, certiorari denied, 1932, 287 U.S. 614, 53 S.Ct. 16, 77 L.Ed. 533.

2. Emanuel v. Kansas City Title & Trust Co., 8 Cir., 1942, 127 F.2d 175.

262

of the personal property damaged or destroyed by the fire was the plaintiff's estimate of replacement cost, less some rough figure for depreciation, at best an unsatisfactory basis for the jury's determination of damages. Plaintiff's Exhibit No. 1, "Inventory of Losses from Fire in Office * * *," valued his professional equipment at $5,919.50 and the furnishings of his office at $1,895.00, a total of $7,814.50. Plaintiff testified that his personal property tax returns would disclose identical or comparable figures. (A. 53) Copies of plaintiff's District of Columbia personal property tax returns for the years 1947, 1948, and 1949 (Defendant's Exhibits 5, 6, and 7), admitted in evidence, show the equipment and furnishings were valued by him at $362.40, $500.00, and $335.00 respectively in the returns. Plaintiff testified (A. 213–214) that he had acquired certain items after the filing of the July 1, 1949, return. But these acquisitions obviously did not account for the very large discrepancy between the doctor's valuations in the tax returns and in his testimony at the trial. The court denied the requested instruction on the ground that the point had not been argued by defendant's counsel. (A. 250–251) I know of no rule of law that a point raised by the evidence must be argued in order to justify an instruction on it.[3]

It is the view of the majority that the plaintiff's misstatements as to the value of the personal property destroyed require a retrial on the issue of damages for loss of personal property, loss of income, and injury to the building in excess of $6,000. Inasmuch as much of the doctor's testimony bearing upon the issue of negligence also was uncorroborated, it is my view that the jury might have reached a different verdict as to negligence, as well as to damages, had the trial court given the requested *falsus in uno, falsus in omnibus* instruction.

In view of these errors, it is unnecessary to consider whether the court should have admitted evidence of plaintiff's failure to obtain a permit for the electric wiring in his office, as raising a presumption of negligent wiring which might have accounted for the fire, or whether the court abused its discretion in refusing to reopen the case to admit evidence of the boiler's content.

I am of the further view that, on filing of the affidavit in support of defendant's motion for a new trial, which disclosed that one of the jurors in the course of the trial had sought and obtained independent advice as to the functioning of a gas furnace under the misrepresentation that she was the new owner of a gas furnace, the court should have required plaintiff to show that the juror did not obtain outside advice or that neither that juror nor her associates were influenced by the information which she had obtained out of court. Indeed, in the absence of direct refutation that such action had been taken by the juror, it would seem to me that a new trial would have been justified.

Although the presumption of prejudice which flows from misconduct of a juror in criminal prosecutions[4] does not apply with equal force in civil actions, this court has indicated that on proof of the misconduct of a civil juror the trial court should make careful inquiry to ascertain

3. Since defendant by introducing plaintiff's tax returns and cross-examining him had raised the issue of plaintiff's veracity in valuation of his personal property, the instant case is distinguishable from Pearce v. Capital Traction Co., 1914, 42 App.D.C. 493, in which this court held error an instruction calling attention to a discrepancy between the declaration and amended declaration, where no evidence had been adduced on the point and no comment thereon had been made by counsel. The court there stated: "Before

advantage could be taken of this discrepancy in plaintiff's case, it should have been brought out in the trial, and the plaintiff given an *opportunity to explain.* * * * Through this instruction the court injected a new issue into the case, upon which plaintiff had not been given an opportunity to be heard."

4. Mattox v. United States, 1892, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917; Duncan v. United States, 1951, 89 U.S.App.D.C. 328, 191 F.2d 779, certiorari denied, 1952, 342 U.S. 928, 72 S.Ct. 368, 96 L.Ed. 691.

that no prejudice resulted to the losing party from such misconduct.[5]

I therefore agree that, if the case is not to be remanded for entry of judgment for the defendant notwithstanding the verdict or for a new trial on all the issues, it should be remanded for rehearing of the motion for new trial in order to determine whether the conduct of juror Martin was prejudicial.

5. Washington Times Co. v. Bonner, 1936, 66 App.D.C. 280, 86 F.2d 836; Kelly v. Moore, 1903, 22 App.D.C. 9, affirmed, 1904, Keely v. Moore, 196 U.S. 38, 25 S. Ct. 169, 49 L.Ed. 376.