**Ruby C. BOURNE, Appellant,**

v.

**Fawan WASHBURN, Appellee.**

**No. 21676.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 11, 1970.

Decided Jan. 4, 1971.

Washington, D. C. (both appointed by this Court) was on the brief, for appellant.

Mr. Sol M. Alpher, Washington, D. C. (appointed by this Court) filed a memorandum on behalf of appellant.

Mr. J. Roy Thompson, Jr., Washington, D. C., for appellee.

Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge, and MATTHEWS,* Senior Judge, U. S. District Court for the District of Columbia.

LEVENTHAL, Circuit Judge:

This is an appeal by plaintiff from a judgment of $3,000.00 entered in her favor against defendant Washburn[1] following a special jury verdict in like amount. . Normally an appellate court declines to sustain a contention of legal inadequacy of amount of verdict. Reversal is required in this case because of error in the instructions given the jury.

At oral argument defendant, now appellee, put it to this court that this was a routine personal injury case, that there were some damages due to neck strain resulting from defendant's negligence, but that the jury disregarded the bulk of medical and hospital charges (of $14,717.50) because its finding was adverse to plaintiff on the crucial issue. That issue, says appellee, is whether the ongoing treatments and charges of plaintiff reflected a neurosis which plaintiff suffered because of the accident, or whether plaintiff was malingering. If that were the basis on which the case went to the jury we would have no difficulty in affirming, as there was medical testimony to support an inference of malingering. But as will appear the judge did not put the case to the jury on that basis. He did not instruct the jury that it might make an award to compensate plaintiff for a traumatic neurosis (or "conversion hysteria") reflecting a psychic weakness that was aggravated by the physical injury caused by the acci-

Mr. Henry W. Leeds, Washington, D. C., with whom Mr. J. Timothy Hobbs,

---

* Sitting by designation pursuant to Title 28, U.S.Code, Section 294(c) (1964).

1. No appeal was taken by plaintiff from the verdict in favor of defendant Keener.

dent. On the contrary he couched his instruction so that pains from traumatic neurosis, referred to as "imaginary," were excised from the zone of the compensable. Instead of drawing a distinction between neurosis and malingering, as appellee now argues, he lumped them together as involving pains that were "imaginary" and non-compensable. This was error, substantially prejudicial to plaintiff, and we reverse.

*Material Testimony*

Since plaintiff was entitled to an instruction in the light of the evidence favorable to her, we focus on that evidence in our statement of the material facts, as follows:

Plaintiff was a passenger in defendant's car on November 2, 1959, at the time of the collision that sent the vehicle to the far curb of the intersection. On impact she bounced to the top of the car, and then bounced back and forward in the car. She felt a severe pain going from the neck to the head. She was taken to the Washington Hospital Center in an ambulance, admitted to the emergency room, treated by an intern who instructed that she rest for a while and then go home, which she did after an hour.

The next day defendant took plaintiff to see Dr. Saul Holtzman, who had examined plaintiff some months previous. He treated her until March 1962. His diagnosis was that she had sustained a fairly severe sprain of the neck, and that "this was followed by a conversion hysteria or another equivalent term would be traumatic neurosis." When the trial judge asked him to explain this in nontechnical terms, the witness replied (Tr. 129–130):

"It's a disturbance of the psyche. It's a problem in which an unstable or inadequate or an emotionally disturbed person who has controlled their problems or their conflicts to the degree that they can get along with society and work suddenly something precipitates a breakdown. In this particular case, trauma, traumatic. And as a result, a picture, a clinical picture, a series of activities or actions develops which is fairly characteristic. It results in an exaggeration of the patient's complaints.

"Now, this is all unknowingly, this is not malingering, this is not willingly. A conversion, they transform or transfer the emotional problems that they have had into these physical ailments. In this particular case, continued neck pain, severe headaches, partial paralysis of the left arm or great weakness of the left arm.

"These patients also exhibit a great deal of anxiety, which is a form of fear and apprehension. It's also again in an exaggerated form.

"And as a result you get a picture of a person having physical ailments where actually they are manifestations of an emotional disturbance.

"Notoriously they are difficult to treat, very stubborn and very chronic."

Dr. Holtzman hospitalized plaintiff from November 5–21, for daily physiotherapy and regular medication. On June 9, 1960, he referred plaintiff to Dr. Groh, who on neurological examination found no evidence of organic neurological disorder and felt that her appearance and statements indicated a problem with a "rather strong emotional overlay." Following plaintiff's continuing complaints of severe pain over the neck and elsewhere, Dr. Holtzman had her hospitalized from June 16 to July 10, 1960, at which time she was placed in head traction, except for meals and toilet. Dr. Holtzman prescribed a cervical collar in September.

After continued complaint Dr. Holtzman sent plaintiff to Dr. Hugo Rizzoli, who found, on examination held January 3, 1961, a slight spasm of the paravertebral muscles on the left (located in the back of the neck, slightly to the side of the spine). This finding of spasm "was based on an objective finding, something that I saw and felt." His diagnosis was "residuals of a strain of the cervical spine," which he concluded was a residual of the November 1959 injury. He

also found "a considerable degree of emotional overlay," reflecting a reaction to the organic injury more than would be expected from a person with normal stability, i. e., in terms of how much a person is bothered and worried by pain.

Other doctors who examined plaintiff later in 1961, at Dr. Holtzman's request, recommended psychiatric evaluation. She refused to seek psychiatric consultation.

There was substantial evidence favorable to defendant including testimony of plaintiff's inconsistency in responses during medical examination. Dr. Harold Stevens, a neurologist, examined her at the request of the court. It was his opinion "that she has a conspicuous conscious element present in her psychological complaints" and "that this pattern of injury was not likely to produce a traumatic neurosis." (Tr. 336).

Consideration of the instruction to the jury requires that we revert to the testimony of Dr. Holtzman. He was asked, on cross-examination (Tr. 132):

Q: Can we agree, Doctor, that the traumatic neurosis, the neurosis must exist prior to the accident? Do we agree on this?

A: Yes; compensated neurosis, I would qualify.

Q: So in this case we had a neurotic individual that was injured?

A: Yes, sir.

Defendant's counsel elicited that Dr. Holtzman had not known that plaintiff had been discharged the day of the accident; the witness agreed that this would be an upsetting thing for a person who is neurotic to some degree.

Later in cross-examination, Dr. Holtzman testified on the difference between traumatic neurosis and malingering. See Tr. 163:

"[T]he term traumatic neurosis implies that a person unconsciously feels the pain or unconsciously believes that they have injury; as distinguished from the term malingering, where the patient consciously attempts to deceive the examiner."

At this point the Court intervened (Tr. 164):

THE COURT: But, Doctor, I want to get away from science for a moment. I am a plain, blunt man and I like simple explanations.

Do all these terms that we have been discussing like traumatic neurosis and conversion hysteria and so on mean that the patient imagines that he or she has pains that do not exist?

THE WITNESS: That is right, sir.

THE COURT: Very well.

A few moments later the witness elaborated, on redirect (Tr. 167):

Q: Doctor, the pain which you stated in response to His Honor's question as being imaginary pain to the patient, is this pain, even if imaginary, something that she really feels? Is it pain to her?

A: Yes, it's pain to her. Let's say that she may not interpret it as pain, she will interpret it as suffering, the equivalent of pain, some type of suffering.

A similar distinction appears in the testimony of Dr. William Novack, a psychiatrist who was called by defendant. He noted that in saying that pain was "imaginary" there would then arise the question whether this was conscious, i. e., fabricated, or unconscious, and that psychosomatic pain may be pain created primarily by unconscious conflicts. As to his examination of Miss Bourne in 1962 (Tr. 303): "I could not explain the pain on the basis of an organic illness. I had the feeling that this was a psychologically induced pain."

*Instruction to Jury*

Now we turn to the instruction given to the jury on damages. Omitting only a half dozen formal paragraphs, the judge charged the jury as follows (Tr. 351–53):

"While the law leaves the question of the amount of damages to the sound

judgment and discretion of the jury, it does lay down certain principles to guide the jury in arriving at the amount, which I shall now summarize:

"First, out-of-pocket expenses, such as medical and hospital services, and the like, that are attributable to the particular injuries caused by the accident; of course the loss of any income, if any, also as a result of the accident; and a suitable sum to compensate the person for the pain and suffering caused by the accident and not by anything else."

\*　　\*　　\*　　\*　　\*　　\*

"As a result of the accident, the doctor's diagnosis is that the plaintiff sustained a strain of her neck muscle. She was removed from the scene of the accident to the Washington Hospital Center. She received treatment in the emergency room, was then released, and went home. A day or two later she went to her doctor, Dr. Holtzman, who had her taken back to the Washington Hospital Center because of her neck muscle strain and similar consequences.

"She remained in the Washington Hospital Center slightly over two weeks, and her bill amounted to $445.-50. She then went home.

"The testimony shows that for several years following she went to numerous doctors from time to time, she went to various hospitals from time to time.

"She claims that her neck and shoulder pain continued, and that these pains were the result of the accident.

"On the other hand, the defendants contend that the continuation of these pains after her first hospitalization was imaginary, that these pains are imaginary and do not exist. In medical language, the testimony is that she was suffering from a converse hysteria or traumatic neurosis. This was the diagnosis given by her own doctor, who testified that she exaggerated her pains, and that she imagines that she has pains that do not exist.

"Other doctors gave similar opinions. Some used somewhat different terms. Some used the term 'anxiety neurosis,' and some used the term 'emotional overlay.'

"You have to weigh the testimony in arriving at what amount to award to the plaintiff for damages.

"Your award should be fair compensation; no less, of course, but no more than the amount that would fairly compensate her for the injuries that she actually sustained and that actually flowed from the accident, and for nothing else."

It is apparent that the judge charged the jury, in effect, that the plaintiff was not entitled to recovery for pains that are "imaginary" in the sense that she suffered from a conversion hysteria. He drove the point home by saying that plaintiff's own doctor supported the contention of defendant.

■ This was of course error, and error that was prejudicial. A plaintiff cannot recover for pains that are "imaginary" in the sense that they are consciously fabricated. But a person who has received physical bodily injury by the wrongful act of another can recover for pains resulting from that injury that are "imaginary" in the sense that such pains are not due to organic ailment but are psychosomatic in origin, and are due to the impact of the injury upon or in aggravation of a pre-existing neurotic or psychic weakness. Parrish v. United States, 123 U.S.App.D.C. 149, 357 F.2d 828 (1966); Thomas v. United States, 327 F.2d 379, 381 (7th Cir. 1964) ("[T]he tort-feasor takes the victim as he finds him.").

Defendant says that no objection was taken by plaintiff to this instruction. There is always a difficulty when counsel is called upon to object to an instruction that has not been made known to counsel in advance but represents an improvisation or interpolation of the judge that once made has impact on the jury that is beyond effective recall. That is the kind of instruction before us. More-

over, while an objection is, of course, necessary to alert the judge to what may otherwise be a purely happenstance or unknowing error, here it seems clear to us, as it must have seemed clear to counsel, that the instruction reflected a deliberate view of the judge.

In this connection the instruction that was given must be taken in the context of an instruction that was refused,— plaintiff's requested instruction number 4 asked for a charge "that the law permits recovery, not only for physical pain and suffering *but for mental anguish and anxiety.*" The judge denied this[2] and instead charged, as we have seen, that general principles permitted recovery "for the pain and suffering caused by the accident,"—from which category he separately and deliberately, but erroneously, excised "imaginary" pain or exaggeration due to conversion hysteria.

*Remand*

It is regrettable that we must reverse and remand since the jury might well have reached the same result if the case had been put to it on the issue whether plaintiff was consciously malingering. But we cannot say there was no substantial prejudice. It is regrettable, too, since the matter has been pending so long. The trial judge has died. The judge to whom the case will be assigned can perhaps serve the cause of justice best by addressing himself to the possibility of settlement.[3] There is no need to reconsider the issue of liability, since the special jury verdict assigning liability to defendant Washburn is supported by evidence, is severable, and may be preserved though there is further inquiry as to issues on damages. Washington Gas Light Co. v. Connolly, 94 U.S.App.D.C. 156,

214 F.2d 254 (1954). The case will be remanded for further proceedings on the issue of damages.

So ordered.

2. The judge disapproved another sentence, relating to suffering in the future. Plaintiff's counsel replied he was sure the judge could adapt the charge in his own fashion, and was told: "Yes. I am not going to be as elaborate as I generally am on the instruction in the amount of damages." (Tr. 320).

An objection to the denial of a requested instruction is considered not necessary when the judge has omitted an item on which the party's position is clear. 5 J. Moore, Federal Practice, § 51.05, at 2530 (2d Ed. 1969). The trial judge made clear that he disliked pro forma objection on a matter he had plainly considered. (Tr. 354–355).

3. Yost v. Sauter, 136 U.S.App.D.C. 237, 420 F.2d 79, 80 (1969).